**15-1019**
*L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term, 2015

(Argued: March 10, 2016     Decided: May 20, 2016)

Docket No. 15-1019

———————

L.O., individually and on behalf of K.T., a child with a
disability,

*Plaintiff-Appellant,*

–v.–

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee.*

———————

Before:

LEVAL, POOLER, AND WESLEY, *Circuit Judges*.

_____

Appeal from an order of the United States District Court for the Southern District of New York (Gardephe, *J.*), entered on March 23, 2015, granting judgment for Defendant-Appellee New York City Department of Education ("DOE") and denying Plaintiff-Appellant L.O., on behalf of herself and her disabled son, K.T., relief under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. In denying L.O. relief, the District Court concluded that K.T. was afforded a free appropriate public education ("FAPE") by the DOE for the 2009–2010, 2010–2011, and 2011–2012 school years. We disagree and hold that the DOE failed to offer K.T. a FAPE for each school year. Accordingly, we **REVERSE** the decision of the District Court and **REMAND** for further proceedings.

PHILIP B. ABRAMOWITZ, Williamsville, NY (Jason Hale Sterne, Cuddy Law Firm, P.C., Auburn, NY, *on the brief*), *for Plaintiff-Appellant*.

ANDREW A. FEINSTEIN, Andrew A. Feinstein, LLC, Mystic, CT, *for* Amicus Curiae Council of Parent Attorneys and Advocates, *in support of Plaintiff-Appellant*.

AMANDA SUE NICHOLS, Assistant Corporation Counsel (Richard Dearing, Assistant Corporation Counsel, *on the brief*), *for* Zachary W. Carter, Corporation Counsel, New York, NY, *for Defendant-Appellee*.

_____

WESLEY, *Circuit Judge*:

Before the court is an action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*., by Plaintiff-Appellant L.O., on behalf of herself

and her son, K.T., now a twenty-year-old autistic child,[1] against Defendant-Appellee the New York City Department of Education ("DOE"). This appeal concerns L.O.'s challenge to the adequacy of three individualized education programs ("IEP"), which were characterized by a pattern of procedural violations of the IDEA committed by the DOE, and whether these errors deprived K.T. of a free appropriate public education ("FAPE") for a period of three consecutive years.

In December 2009, the DOE convened a local Committee on Special Education ("CSE") meeting for the purpose of developing an IEP for K.T. for the 2010 academic year. K.T. enrolled in the IEP's prescribed placement and continued to attend as provided for by two subsequent IEPs in December 2010 and March 2011, until he began refusing to attend school in November 2011.[2] Thereafter, L.O. filed a due process complaint against the DOE, claiming procedural and substantive violations

---

[1] K.T. will celebrate his twenty-first birthday on October 23, 2016.

[2] Although L.O. claims that K.T.'s school refusal behavior began as early as January 2010, she provides no evidence other than her own testimony to support this claim. Because Ms. Quinones (K.T.'s special education teacher), Assistant Principal Rivas, and Peter Doran (the Medicaid Service Coordinator) all testified before the IHO that K.T.'s refusal to attend school did not commence until the fall of 2011, we cannot say that the District Court erred in determining that the preponderance of the evidence established that this interfering behavior did not manifest until after the formulation of the March 2011 IEP. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) ("[T]he district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997))).

of the IDEA, and that K.T. had been deprived of a FAPE for the 2009–2010, 2010–2011, and 2011–2012 school years. Specifically, L.O. sought, among other things, the completion of further evaluations,[3] program modifications, compensatory services, and attorney's fees and costs.

Following a five-day hearing, an impartial hearing officer ("IHO") denied L.O. that relief. L.O. appealed to a state review officer ("SRO") who affirmed that decision. Thereafter, L.O. brought suit in the United States District Court for the Southern District of New York (Gardephe, *J.*), which affirmed the order of the SRO. *See L.O. v. N.Y.C. Dep't of Educ.*, 94 F. Supp. 3d 530, 537 (S.D.N.Y. 2015). L.O. appealed, contending primarily that the three IEPs formulated for K.T. violated the IDEA and deprived him of a FAPE. For the reasons set forth below, we **REVERSE**.

## BACKGROUND

### I.    LEGAL FRAMEWORK

The IDEA requires "[a] state receiving federal funds under the IDEA [to] provide disabled children with a [FAPE]." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174–75 (2d Cir. 2012). School districts, through a CSE,[4] are responsible for formulating

---

[3] In an interim order, the IHO directed the DOE to perform the requested evaluations.

[4] "In New York, the state has assigned responsibility for developing IEPs to local [CSEs]." *R.E.*, 694 F.3d at 175. "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).

a written IEP for every qualifying child. *Id.* at 175; *see also* 20 U.S.C. § 1414(d). The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E.*, 694 F.3d at 175 (internal quotation marks omitted). To comply with the provisions of the IDEA, the IEP must "be 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)).

If a parent believes that his or her child is being denied a FAPE, the parent may file a "due process complaint" challenging "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). Doing so "triggers an administrative procedure by which the board of education appoints an [IHO] who conducts a formal hearing and fact-finding. The decision of an IHO may be appealed to a[n] [SRO], and an SRO's decision may be challenged by filing a civil action in state or federal court." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (per curiam) (citations and internal quotation marks omitted) (citing 20 U.S.C. § 1415(g), (i)(2)(A); N.Y. Educ. Law § 4404(1)–(3)).

## II. STATEMENT OF FACTS
### A. K.T.

K.T. is an autistic child born in October 1995 who suffers from obsessive compulsion disorder, mild mental retardation,

mood disorder, asthma, and pica.[5] Since he was first diagnosed with autism at the age of four, K.T. has attended public special education programs in a 6:1:1 (i.e., six students, one teacher, one paraprofessional aide) special classroom setting with the support of related services including speech-language, occupational, counseling, and physical therapies. In 2009, K.T. began attending PS 811X, a public special education school located in the Bronx, New York. In accordance with his IEP formulated in December 2008, K.T. was placed in a 6:1:1 special class setting where he continued to receive the same support services as in prior years.

### B. K.T.'s December 2009 Individualized Education Program

On December 2, 2009, a CSE team convened for its annual meeting to develop an IEP for K.T. for December 14, 2009 to December 14, 2010 (i.e., the 2009–2010 school year).[6] The IEP described K.T. as a fourteen-year-old "partially verbal autistic young man" who understood "one-step commands," and "communicate[d] with others by pointing to what he want[ed] or need[ed]." Pl.'s Ex. 6 at 1, 3. The IEP further observed that K.T.'s writing ability was limited to "copying letters, at times his letter

---

[5] As described by the District Court, "pica" is "'compulsive eating of nonnutritive substances, such as ice . . . , dirt . . . , gravel, flaking paint or plaster, clay, hair . . . , or laundry starch.'" *L.O.*, 94 F. Supp. 3d at 537 n.1 (quoting *Dorland's Illustrated Medical Dictionary* 1466 (31st ed. 2007)). Here, K.T.'s pica is exhibited "by putting staples in his mouth, which he finds comforting. He does not eat them, but will sometimes swallow them by accident." Suppl. App. 26.

[6] Present at this meeting were (1) L.O., (2) a DOE representative, (3) a special education teacher, (4) a physical therapist, (5) an occupational therapist, (6) a speech therapist, (7) a related services counselor, and (8) a Medicaid Service Coordinator.

6

overlap," and that he "c[ould] write numbers 1–10." Pl.'s Ex. 6 at 3. It also noted that he suffered from frequent and sudden mood and personality changes, restlessness, and that he would become "verbally and physically aggressive, many times for no apparent reason," and also "engage[d] in self-abusive behaviors such as punching himself in the head, scratching himself, and eating staples." Pl.'s Ex. 6 at 4.

The IEP recommended placement in a 6:1:1 "[s]pecial class in a specialized school with related services" for a twelve-month school year. Pl.'s Ex. 6 at 1. The CSE further observed, however, that K.T. "benefit[ted] from a small [and] highly structured class setting" and "forms of positive reinforcement," and that K.T.'s "[b]ehavior seriously interfere[d] with instruction and require[d] additional adult support." Pl.'s Ex. 6 at 3, 4. Accordingly, the IEP recommended that K.T. participate in an "Alternative Assessment" program due to the "[s]everity of [his] deficits in cognitive, communication, and social development." Pl.'s Ex. 6 at 12. The CSE also recommended that K.T. continue to receive a number of related services, including speech-language services twice per week for thirty minutes in a group of three, as well as physical and occupational therapy, but discontinued K.T.'s counseling services from the prior IEP. The December 2009 IEP further set forth nine annual goals and twenty-four short-term objectives for K.T. during the 2009–2010 school year. The IEP also provided a plan for K.T. to transition to adult living.

Moreover, based on the CSE's conclusion that K.T.'s behaviors seriously interfered with instruction, the IEP required the development of a behavioral intervention plan ("BIP"), which was incorporated into the IEP. A BIP is generally used to "develop[] . . . strategies to deal with . . . problem behavior(s)." *R.E.*, 694 F.3d at 190 (citing N.Y. Comp. Codes R. & Regs. tit. 8,

§ 200.22(b)). The BIP identified K.T.'s inability to pay attention and concentrate, and noted that he displayed "poor anger management" and various self-abusive behaviors. Pl.'s Ex. 6 at 16. To manage these behaviors, the BIP suggested "[p]rovid[ing] constant positive reinforcement," through the support from a classroom paraprofessional, using tangible rewards and privileges, and using discipline to punish K.T. for exhibiting poor behavior. Pl.'s Ex. 6 at 16. The BIP did not, however, attempt to identify the root causes of K.T.'s problem behaviors. Nor did the CSE request or develop a functional behavior assessment ("FBA"), an assessment designed to "identif[y] . . . the problem behavior, . . . defin[e] . . . the behavior in concrete terms, . . . identif[y] . . . the contextual factors that contribute to the behavior (including cognitive and affective factors) and . . . formulat[e] . . . a hypothesis regarding the general conditions under which a behavior usually occurs." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r). K.T. continued to attend his 6:1:1 public school placement throughout the 2009–2010 school year at PS 811X.

### C. K.T.'s December 2010 Individualized Education Program

On December 20, 2010, the CSE reconvened to formulate a new IEP for K.T. for January 11, 2011 to January 11, 2012 (i.e., the 2010–2011 school year).[7] The CSE determined that K.T.'s services should remain unchanged from the prior year and that K.T. should continue with his alternate assessment curriculum. The

---

[7] Present at this meeting were (1) L.O., (2) a DOE representative, (3) K.T.'s special education teacher, Myrna Quinones, (4) a speech pathologist, and (5) K.T.'s Medicaid Service Coordinator.

December 2010 IEP provided new annual goals and short-term objectives, as well as a transition plan and a BIP nearly identical to that developed for K.T. for the prior school year. K.T. continued to attend his public school placement under the new IEP at PS 811X.

### D. K.T.'s March 2011 Individualized Education Program

Shortly thereafter, on January 18, 2011, L.O. wrote to the CSE and requested an immediate reevaluation of K.T. to ensure that he was receiving appropriate services in an appropriate educational setting. The CSE agreed and reconvened on March 7, 2011 to review K.T.'s IEP.[8] The March 2011 IEP formulated by the CSE for March 21, 2011 to March 21, 2012 (i.e., the 2011–2012 school year), recommended that K.T.'s services remain unchanged from the December 2011 IEP and that he continue his placement in the alternative assessment program and receive the same speech, physical, and occupational therapy services. The March 2011 IEP provided no new annual goals or short-term objectives, included a transition plan identical to that contained in the December 2010 IEP, and, although the March 2011 IEP stated that a new BIP had been developed for K.T., none was incorporated in the IEP. Thereafter, K.T. continued to attend the 6:1:1 public school placement until November 18, 2011, when he began refusing to attend school.

### E. Administrative Review

On December 9, 2011, L.O. filed a due process complaint, claiming that the DOE had failed to provide K.T. with a FAPE for the 2009–2010, 2010–2011, and 2011–2012 school years. L.O.

---

[8] Those present at this meeting included (1) L.O., (2) a DOE representative, (3) K.T.'s special education teacher, Myrna Quinones, (4) a school psychologist, and (5) K.T.'s Medicaid Service Coordinator.

alleged eighteen separate deficiencies in the IEPs developed for K.T., including that (1) the IEPs failed to reflect reliance on any evaluations or assessments of K.T., (2) the CSE created BIPs without the benefit of FBAs resulting in his refusal to attend school, (3) the DOE failed to provide adequate speech-language services, (4) the CSE failed to develop annual goals that adequately addressed K.T.'s educational needs, (5) the IEPs failed to provide parent counseling and training as a related service, and (6) K.T.'s significant deterioration as a result of inappropriate programming had led to the need for a residential private school placement.

On January 10, 2012, a five-day impartial hearing commenced before an IHO, which heard testimony from nine witnesses.[9] On April 18, 2012, the IHO rejected L.O.'s challenge to the appropriateness of K.T.'s December 2009, December 2010, and March 2011 IEPs, and denied L.O.'s claim for relief.

L.O. appealed the IHO's decision to an SRO. On March 15, 2013, the SRO affirmed the IHO's decision and dismissed the appeal, concluding that all three IEPs were properly designed to address K.T.'s educational needs. In reaching its conclusion, the SRO rejected L.O.'s claim that there was no evidence that the CSE had reviewed K.T.'s evaluations in preparing his IEPs,

---

[9] L.O. offered testimony from four witnesses: (1) Carol Bufano, a former DOE related services coordinator; (2) Gracie President, the program manager for Service for the Underserved; (3) Peter Doran, the Medicaid Service Coordinator for Services for the Developmentally Challenged; and (4) K.T.'s mother. The DOE offered testimony from five witnesses: (1) Myrna Quinones, K.T.'s special education teacher; (2) Eleyna Rivas, the assistant principal at K.T.'s school; (3) Charlene Torres, a speech teacher; (4) Kim McPherson, an occupational therapist; and (5) Charito Labay, a physical therapist.

finding that, although the record did not show which evaluative information was reviewed during the CSE meetings, the evidence in the hearing record nevertheless was consistent with the information contained in the evaluations.

As to the DOE's failure to develop FBAs in any of the IEPs in accordance with New York regulations, the SRO determined that this failure did not amount to a FAPE deprivation because the IEPs adequately identified the problem behaviors and prescribed ways to manage them. As to the lack of a BIP in the March 2011 IEP, the SRO reasoned that a BIP was unnecessary at the time of the March 2011 IEP because K.T.'s level of social/emotional performance "remained unchanged from the previous IEP," which included a BIP. App. 58. Further, with respect to K.T.'s refusal to attend school, the SRO concluded that this behavior did not begin until well after the preparation of the March 2011 IEP and therefore was not relevant for purposes of evaluating the adequacy of the March 2011 IEP.

Further, the SRO considered L.O.'s argument that the IEPs' provision of two weekly thirty-minute sessions of speech-language therapy in a group of three was in violation of New York law because the regulations required daily instructional services, but found it to be without merit because daily language instruction was not required under the current regulations. The SRO also noted that K.T.'s teacher testified that additional speech-language services were available to K.T. in the classroom. In addition, as to the IEPs' goals and objectives, the SRO determined that "the annual goals and short term objectives . . . contained sufficient specificity by which to guide instruction and intervention, evaluate [K.T.'s] progress, and gauge the need for continuation or revision, and they contained adequate evaluative

11

criteria."[10] App. 42. Last, the SRO determined that, although the CSE erred by omitting provisions for parental counseling and training in the IEPs, this failure did not deprive K.T. of a FAPE.

## F. District Court Review

Thereafter, L.O. brought this action in the District Court, claiming procedural and substantive violations under the IDEA resulting in the denial of a FAPE for K.T, and seeking a reversal of the SRO's decision. The parties each separately moved for summary judgment, and on March 23, 2015, the District Court, relying heavily on the SRO's analysis, affirmed that decision.

First, as to the DOE's claim that the CSE failed to review any of the evaluative materials in developing the IEPs, the District Court reviewed each IEP and held that, although the record did not indicate which specific evaluative materials the CSE had considered in formulating the IEPs, each IEP was "consistent with evaluative material available to the CSE at the time of these meetings." *L.O.*, 94 F. Supp. 3d at 555. Accordingly, the District Court held that, to the extent such a failure to identify specific evaluative materials upon which it relied in formulating an IEP amounts to a procedural violation of the IDEA, this did not deny K.T. a FAPE.

The District Court next considered L.O.'s claim that K.T. was deprived of a FAPE because the DOE failed to conduct an FBA in connection with any of the IEPs despite the presence of K.T.'s significant interfering behaviors. Despite this omission, the District Court found that the December 2009 and December

[10] The SRO noted, however, "that one goal related to fine motor skills failed to include the frequency that the student's progress would be reported to the parent," and directed the DOE "to comply with this requirement." App. 42.

12

2010 IEPs each contained BIPs that sufficiently addressed K.T.'s interfering behaviors and provided strategies to improve his behavioral performance and therefore there was no violation of the procedures of the IDEA. The District Court, however, did not address the lack of a BIP in the March 2011 IEP. As to L.O.'s claim that the March 2011 IEP was equally deficient, as highlighted by K.T.'s eventual refusal to attend classes in the fall of 2011, the District Court rejected the argument because K.T.'s refusal to attend class did not begin until many months after the March 2011 IEP had been developed, and the District Court's review of the adequacy of the IEP was limited to the written plan itself and the information available to the parties at the time the plan was formulated. Accordingly, the District Court held that there was no error on the part of the DOE and that the SRO correctly refused to consider K.T.'s attendance issues in reviewing the adequacy of the March 2011 IEP.

Next, the District Court evaluated whether the IEPs adequately addressed K.T.'s speech and language needs. It noted that, although each IEP provided for speech-language therapy twice each week for thirty minutes in a group of three, prior to December 2010, at the time the December 2009 IEP was prepared, New York law required that such services be provided to autistic students daily, in groups of two or less for thirty minutes or in groups of six or less for sixty minutes. The District Court observed that neither the IHO nor the SRO recognized that the speech-language services provided for in the December 2009 IEP for K.T. were consequently in violation of New York law. It thus declined to defer to either of their findings concerning the question of whether the December 2009 IEP's provisions for speech-language instruction denied K.T. a FAPE. Nonetheless, despite this procedural error in the December 2009 IEP, the District Court concluded that the IEP "adequately

13

addressed K.T.'s speech and language needs."[11] *Id.* at 560. As to the December 2010 and March 2011 IEPs, which also recommended that K.T. receive speech-language therapy twice weekly for thirty minutes in a group of three, the District Court noted that these IEPs were developed after the 2010 amendment to the New York regulation and therefore were in accordance with New York law. The District Court further agreed with the SRO that the speech-language provisions of the December 2010 and March 2011 IEPs were appropriate.[12]

---

[11] The District Court observed that the December 2009 IEP provided goals to improve K.T.'s reading and social interaction skills with 80% accuracy, and that the IEP included short-term objectives to improve his ability to play board games, which would allow him to experience progress in his receptive language skills and ability to follow directions. The District Court also noted that K.T. had experienced progress in his speech-language skills under the prior two IEPs and that the CSE thus reasonably concluded that the continuation of the twice-weekly group speech-language program was appropriate for K.T.

[12] The District Court noted K.T.'s continued progress in the social interaction goals included in the December 2009 IEP, which supported the CSE's determination for K.T. to continue the same speech-language program moving forward. With respect to the March 2011 IEP, the District Court observed that the IEP continued to recommend that K.T. receive the same speech-language services as those provided for in the December 2010 IEP. Although L.O. argued that K.T. had experienced minimal progress between December 2009 and March 2011 and thus a new program should have been generated for K.T., the District Court disagreed, finding that, during this three-month period, K.T. had made *some* progress with his goals and that his teacher reasonably anticipated that he would meet his goals with more time.

The District Court also considered the DOE's alleged failure to appropriately develop adequate goals in the IEPs that satisfied K.T.'s educational needs and agreed with the SRO that the goals set by the CSE in the December 2009 and December 2010 IEPs were appropriate in light of K.T.'s needs at the time.[13] As for the March 2011 IEP, however, the District Court observed certain deficiencies unidentified by the SRO. Specifically, it observed (1) the lack of goals related to K.T.'s occupational and physical development despite no notable change in K.T.'s needs since the formulation of the December 2010 IEP, and (2) the March 2011 IEP recommended that K.T. continue to receive occupational and physical therapy, yet omitted the frequency with which K.T.'s progress would be reported by the DOE. The District Court found that the IEP's lack of goals related to K.T.'s occupational and physical needs constituted a procedural violation but that, because the March 2011 IEP continued K.T.'s physical and occupational therapy programs, as well as a transition plan carried over from the December 2010 IEP, which set goals related to K.T.'s functional and occupational skills, the March 2011 IEP did not deny K.T. a FAPE because it contained "detailed and objective standards by which [K.T.'s] progress c[ould] be measured on both an annual and short-term basis." *Id.*

---

[13] More specifically, although the December 2009 IEP did not explicitly mention K.T.'s toileting needs or that he suffered from pica, the District Court observed that the IEP included goals related to K.T.'s "self-abusive behaviors such as . . . eating staples," and that he must therefore "be observed consistently," and it also provided an annual goal of "improv[ing] [K.T.'s] fine motor skills necessary for performing [activities of daily living] and [s]chool activities." *L.O.*, 94 F. Supp. 3d at 557 (third and fourth alterations in original) (internal quotation marks omitted).

15

at 557 (first alteration in original) (internal quotation marks omitted).

Next, the District Court noted the DOE's failure to provide for parental training and counseling in accordance with New York law in each of the IEPs, which it concluded amounted to a procedural violation under the IDEA. Nonetheless, the District Court agreed with the SRO that this violation on its own did not amount to a denial of a FAPE for any school year.

Last, the District Court considered the cumulative effect of the multiple procedural violations in this case but found that "[t]hese deficiencies, even when considered cumulatively, did not deny a FAPE to K.T.," because these deficiencies were "more formal than substantive." *Id.* at 571 (internal quotation marks omitted).

## DISCUSSION

"We undergo a circumscribed *de novo* review of a district court's grant of summary judgment in the IDEA context because the 'responsibility for determining whether a challenged IEP will provide a child with [a FAPE] rests in the first instance with administrative hearing and review officers.'" *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013) (alteration in original) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012)). "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). "This review 'requires a more critical appraisal of the agency determination than clear-error review' but 'falls well short of complete *de novo* review.' Accordingly, our *de novo* review only seeks to independently verify that the

16

administrative record supports the district court's determination that a student's IEP was adequate." *M.W.*, 725 F.3d at 138 (quoting *M.H.*, 685 F.3d at 244) (citing *R.E.*, 694 F.3d at 184).

Our role in reviewing the agency's determination is further constrained "by our lack of specialized knowledge and educational expertise," requiring "'defer[ence] to the administrative decision [particularly where] the state officer's review has been thorough and careful.'" *Id.* at 138–39 (second alteration in original) (quoting *R.E.*, 694 F.3d at 184). That is, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. The level of deference granted to the administrative decision, however, is not without limitation. To merit deference, "[t]he SRO's or IHO's factual findings must be 'reasoned and supported by the record.'" *M.H.*, 685 F.3d at 241 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007)).

## I.   PROCEDURAL VIOLATIONS

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *R.E.*, 694 F.3d at 189–90. As all of the alleged violations are procedural in nature, only the first step is relevant here. At this step, we "examine[] the procedural adequacy of the IEP, asking 'whether the state has complied with the procedures set forth in the IDEA.'" *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014) (quoting *R.E.*, 694 F.3d at 190). Under this framework, "[p]rocedural violations will entitle parents to [relief] only if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child,' or 'caused a deprivation of educational benefits.'" *Id.* (third and

fourth alterations in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *M.W.*, 725 F.3d at 139. "'[M]ultiple procedural violations[,] [however,] may cumulatively result in the denial of a FAPE even if the violations considered individually do not.'" *Id.* (quoting *R.E.*, 694 F.3d at 190). Here, L.O. alleges that the DOE committed multiple procedural errors in formulating each of K.T.'s IEPs, independently and cumulatively resulting in the denial of a FAPE for each school year.

## A. Evaluative Data

L.O.'s first attack on the procedural adequacy of the three IEPs is that there is no record evidence that the CSE reviewed any evaluative materials in developing K.T.'s December 2009, December 2010, and March 2011 IEPs, which amounted to a denial of a FAPE to K.T. In formulating a student's IEP, the IDEA requires a CSE to "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A); *see also* 34 C.F.R. § 300.324(a)(1)(iii) ("In developing each child's IEP, the IEP Team must consider . . . [t]he results of the initial or most recent evaluation of the child . . . .").

Although the SRO agreed that "the [DOE] did not show which evaluative information was reviewed during the course of the CSE meeting[s]" and that there was no "evidence that any of [K.T.'s] evaluations were reviewed by the CSE in preparation for or during any of the three CSE meetings at issue," the SRO determined that "the hearing record contain[ed] evaluative

18

materials that, based on their date, existed at the time of each of the CSE meetings," and "from which [K.T.'s] IEP could be developed." App. 37, 41. The SRO further concluded that K.T.'s IEPs were "prepared in a manner consistent with information included in the evaluative materials that had been conducted at the time of the . . . CSE meeting[s] and that there was no denial of a FAPE due to inadequate evaluation or an insufficient statement of [K.T.'s] needs in the . . . IEP[s]." *See* App. 41. The District Court agreed and affirmed, holding that, although the failure to cite specific evaluative materials constituted a violation of the procedures of the IDEA, "all of the IEPs [were] consistent with evaluative material available to the CSE at the time of these meetings" and thus the violations "did not deny K.T. a FAPE." *L.O.*, 94 F. Supp. 3d at 555.

The SRO's analysis of L.O.'s claim as to each IEP is indeed thorough; it devotes nearly thirteen full single-spaced pages to its comparison of the terms of each IEP with the evaluative materials in existence at the time the IEP was developed. We defer to the SRO's careful analysis and its ultimate conclusion that the provisions in each IEP were generally consistent with the evaluative materials available to the CSE, and that K.T. was not deprived of a FAPE as a result of the procedural error. Despite this conclusion, this violation deserves further explanation, as the SRO and District Court failed to appreciate its implications, particularly under the facts of this case.

As noted, both the statute and its implementing regulations *require* a CSE, in developing a child's IEP, to consider the most recent evaluative data of the child. *See* 20 U.S.C. § 1414(c)(1)(A); 34 C.F.R. § 300.324(a)(1)(iii). It therefore follows that the burden rested with the DOE to demonstrate which evaluative materials were reviewed during each CSE meeting in reaching the terms of the IEPs, a burden that both the SRO and

19

District Court concluded the DOE failed to carry. The purpose of the requirement is to ensure that a CSE, in formulating a student's IEP, provides the student with services narrowly tailored to his or her particular educational needs based on actual and recent evaluative data from the student's education providers, so that the developed IEP will reasonably enable the child to receive the educational benefits to which he or she is entitled by law. Where, as here, however, the CSE failed to memorialize how it reached the terms of the IEPs, reviewing authorities and courts are left to speculate many months, or as in this case, many years, later as to how the CSE reached the terms of the child's IEP (i.e., which, if any, evaluative materials the CSE actually considered). The resulting implication of this procedural violation is that it provides the reviewing authority with almost unfettered discretion, as it combs through the evaluative materials generated at the time the IEP was formulated, to match terms of the IEP to any assertion contained in any existing document, irrespective of whether it was actually viewed and considered by the CSE or even in possession of the CSE at the time of the meeting.

Further, the SRO and District Court's conclusion that what mattered was the existence of evaluative materials at the time of the relevant CSE meeting that corroborated the terms of the IEP misses the point. The statute requires that a CSE actually review evaluative data and base the terms of the student's IEP on that information. The rule fashioned by the SRO and District Court ignores the plain language of the statute entirely. Rather, it permits the reviewing body to offer post hoc rationalizations for how the CSE reached its conclusions and refer to documents that may or may not have been in possession of the CSE at the time of the meeting.

Further, this violation calls into question whether, as shall be seen, the other errors and omissions in the IEPs were a result of oversight because the CSE failed to review any of the evaluative materials available to it or a result of a deliberate decision on the part of the CSE based on its specialized knowledge and educational expertise. Indeed, Myrna Quinones, K.T.'s special education teacher who was present at the March 2011 CSE meeting, testified before the IHO that she could not recall reviewing any evaluative material at the CSE meeting, nor could she recall the CSE team engaging in any discussion about K.T.'s skills or functioning. Put differently, this violation casts doubt on the SRO's remaining conclusions and analyses regarding how the CSE reached the remaining terms of the IEPs.

Last, to the extent the DOE relies on this Court's holding in *R.B. v. New York City Department of Education*, 589 F. App'x 572, 575 (2d Cir. 2014) (summary order) for the proposition that L.O. is precluded from contesting the absence of evaluative information during the CSE meetings because she could have raised the matter during or immediately following each meeting at which she was present, we disagree. Whether L.O. could have objected to the absence of evaluative materials or the CSE's failure to consider adequate evaluative information in formulating K.T.'s IEPs does not absolve the DOE from carrying out responsibilities imposed on it by Congress.[14]

Accordingly, although we affirm the SRO's determination that this violation, standing alone, did not deprive K.T. of a

---

[14] Importantly, L.O. consistently raised this objection during the administrative proceedings below and before the District Court. We can find nothing in the statute that imposes an obligation on a parent to raise such an objection during the CSE meeting.

FAPE, it is clear that, at a minimum, this failure constituted a serious violation of the procedures of the IDEA in this case.

### B. Functional Behavior Assessments and Behavioral Intervention Plans

Under New York law, the DOE is required to conduct an FBA "for a student whose behavior impedes his or her learning or that of others." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v); *see also R.E.*, 694 F.3d at 190. An FBA includes "the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior[,] . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r). The "purpose of an FBA is to ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors." *R.E.*, 694 F.3d at 190. Further, where, as here, "a student's behavior impedes his learning, a BIP must be developed with strategies to deal with the problem behavior(s)." *Id.* (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b)). A BIP must be "based on the results of a[n] [FBA] and, at a minimum, include[] a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm).

Where, as here, however, a child's behavior impedes learning and no FBA has been conducted, we must "take particular care to ensure that the IEP adequately addresses the child's problem behaviors." *R.E.*, 694 F.3d at 190. Although we have explained that the "[f]ailure to conduct an FBA . . . does not render an IEP legally inadequate under the IDEA so long as the

22

IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior," *M.W.*, 725 F.3d at 140, we have cautioned that "[t]he failure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all," *R.E.*, 694 F.3d at 190. "[S]uch a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP." *Id.*

Here, each IEP indicated that the CSE determined that K.T.'s behavior seriously interfered with his instruction and therefore required additional adult support, and thus that a BIP had been developed. As noted, although the December 2009 and December 2010 IEPs developed BIPs, the DOE failed to conduct an FBA of K.T. until December 2011, after K.T. stopped attending classes. Moreover, although the March 2011 IEP stated that a new BIP was developed for K.T., no BIP was attached to the March 2011 IEP. The December 2009 and December 2010 IEPs and BIPs are substantially similar to one another. Although no FBA was developed for either IEP, the SRO concluded and the District Court agreed that this did not result in a deprivation of a FAPE for K.T. because the IEPs, with the attached BIPs, adequately identified K.T.'s behavioral impediments and implemented strategies to address these problematic behaviors.

L.O. contends that the DOE's development of BIPs without available FBAs amounts to a serious violation of the IDEA's procedures and resulted in a FAPE deprivation for K.T. Specifically, she maintains that the omission of FBAs prevented the DOE from identifying and thus eliminating the factors actually causing K.T.'s interfering behaviors.

The IEPs identified K.T.'s social and emotional behaviors—including that he often experienced rapid mood changes and had become self-abusive, verbally and physically aggressive, restless, and at times, upset, anxious, and irritated—and provided ways to manage them, through positive reinforcement and praise from K.T.'s service providers. Nonetheless, the SRO's conclusion that the IEPs were adequate in this regard was error.

While the December 2009 and December 2010 IEPs appear to address K.T.'s problematic social and emotional behaviors, and provided strategies for addressing these behaviors, absent from either IEP are "global and specific hypotheses as to why the problem behavior[s] occur[red]" as required by New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm). Further, as prescribed by the regulations, determining the cause of a handicapped child's problem behaviors is a minimum requirement. *See id.* ("Behavioral intervention plan means a plan that is based on the results of a[n FBA] and, *at a minimum*, includes . . . global and specific hypotheses as to why the problem behavior occurs . . . ." (emphasis added)). That is, although each IEP contained a BIP, neither attempted to identify the root causes of these behavioral deficiencies so that they could be properly addressed and treated. Indeed, the December 2009 IEP notes that the CSE and K.T.'s service providers did not know why K.T. displayed these interfering behaviors. *See* Pl.'s Ex. 6 at 4 ("Often times, [K.T.'s] mood and personality change *without the staff or teacher realizing the antecedent behavior or underlying cause.* At times he appears happy, while during other times, he appears upset, anxious, irritated, and frustrated. . . . He can be verbally and physically aggressive, many times for no apparent reason." (emphasis added)). Had an FBA been conducted, the CSE might

24

have been able to identify what caused K.T. to behave in certain ways, and provide effective treatment for these behaviors.

Moreover, the March 2011 IEP's deficiencies are aggravated by the fact that, in addition to the absence of an FBA, no BIP was developed for K.T. Although the SRO observed that K.T.'s interfering behaviors remained unchanged from the previous IEP and that no BIP was developed, the SRO reached no conclusion regarding whether this omission constituted a procedural error, a deprivation of a FAPE, or any error at all. Although the description of K.T.'s social and emotional behaviors may not have changed between the development of the December 2010 IEP and March 2011 IEP, this did not excuse the CSE from complying with its legal obligations to develop a BIP for K.T., whose problem behaviors impeded learning. Indeed, the IEP itself indicates that the CSE believed that a BIP was warranted, yet the CSE failed to follow through with its own directive. *See* Pl.'s Ex. 3 at 4 (noting that "[a] behavior intervention plan has been developed").

Further, we have repeatedly stated that the "failure to conduct an FBA is a particularly serious procedural violation for a student who has significant interfering behaviors." *See R.E.*, 694 F.3d at 194. Because the CSE failed to address the root causes of K.T.'s behavioral deficiencies, we are unable to determine whether the IEPs adequately identified K.T.'s behavioral impediments and whether the strategies formulated to address those behaviors were appropriate.[15] *See id.* at 190. Accordingly,

---

[15] In connection with the omission of an FBA and BIP in the March 2011 IEP, L.O. insists that the SRO and District Court failed to appreciate that K.T.'s deteriorating behaviors, such as his refusal to attend school, were a direct result thereof, that the DOE failed to promptly reconvene a CSE meeting regarding K.T.'s attendance issues,

the omission of FBAs in each IEP and the absence of a BIP in the March 2011 IEP constituted serious procedural violations impairing our ability to review the adequacy of the IEP provisions.

### C. Speech-Language Therapy

As noted previously, each IEP provided for speech-language therapy two times weekly for thirty minutes in a group

---

and that he was consequently deprived of a FAPE during the 2011–2012 school year. While we find it unsurprising that K.T.'s behaviors continued to deteriorate to this level given the DOE's repeated failure to adequately address his interfering behaviors over the years, we must reject L.O.'s claim. As the SRO correctly found, because K.T.'s refusal to attend school did not commence until after the development of the March 2011 IEP, it can have no bearing on the adequacy of that particular IEP. *See R.E.*, 694 F.3d at 186 ("[T]he IEP must be evaluated prospectively as of the time of its drafting."). That is, because we must review the adequacy of the IEP at the time it was offered, based on the information the CSE had at that time, K.T.'s refusal to attend school many months later cannot affect the adequacy of the IEP. As the SRO noted, whether the DOE should have convened at an earlier date to address this new problem behavior is a matter for a future proceeding, but it is not relevant to the present one before us. Indeed, L.O. commenced a separate action challenging the adequacy of the subsequent IEP formulated in March 2012, including the CSE's failure to address K.T.'s school avoidance behaviors. In that action, L.O. was awarded compensatory services by an IHO for a ten-month period (i.e., the duration for which K.T. had been without any schooling and services since the last day covered by the IHO's ruling in the present action), which extended beyond K.T.'s period of eligibility to receive services under the IDEA (i.e., beyond his twenty-first birthday), and K.T. was subsequently placed in a residential private school education program. That decision was uncontested by the parties.

of three. L.O. maintains that this level of speech-language services was not reasonably calculated to afford K.T. an opportunity to obtain educational benefits and thereby deprived him of a FAPE.

### 1. *December 2009 IEP's Speech-Language Provision*

In December 2009, at the time K.T.'s December 2009 IEP was prepared, New York regulations required that instructional speech and language services "be provided to meet the individual language needs of a student with autism for a minimum of 30 minutes *daily* in groups not to exceed two, or 60 minutes *daily* in groups not to exceed six." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(4) (amended Dec. 8, 2010) (emphases added). Although the IHO and SRO each construed the incorrect version of the applicable regulation and thus failed to appreciate the procedural error in this case, the District Court correctly found that K.T.'s December 2009 IEP's provision for two speech-language therapy sessions per week, rather than daily sessions, violated the then-existing regulation. Moreover, although unidentified by the District Court, the group size of K.T.'s instruction (i.e., three students) also violated the regulation, which required that a student with autism that received daily speech-language services for thirty minutes be in a smaller group "not to exceed two." *Id.* Despite finding a procedural violation and declining to defer to the findings of either the IHO or SRO on this matter because neither administrative officer recognized the applicable regulation, the District Court nonetheless held that "the record demonstrate[d] that the December 2009 IEP adequately addressed K.T.'s speech and language needs." *L.O.*, 94 F. Supp. 3d at 560. Specifically, the District Court found that the 2009 IEP contained adequate goals and objectives that were tailored toward improving K.T.'s reading, social interaction, and receptive language skills. The

27

District Court also found that reports on the record indicated that K.T. had made progress in his speech-language skills under the prior IEPs, suggesting that it was appropriate to continue the same speech-language program for K.T. under the current IEP. In support of its conclusion that K.T. was receiving adequate speech-language services under the 2009 IEP, the District Court further relied on testimony from the IHO hearing from Ms. Quinones, K.T.'s special education teacher, who testified that she incorporated "language acquisition in the class . . . curriculum" by "collaborat[ing] with the speech and language teacher." *See* IHO Hearing Tr. 115. We disagree with the District Court's assessment.

The District Court's reliance on the testimony of Ms. Quinones regarding the provision of additional speech-language instruction in the classroom was error, as it was impermissibly retrospective. *See R.E.*, 694 F.3d at 186 ("[T]he IEP must be evaluated prospectively as of the time of its drafting and therefore . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered."); *see also P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., (Region 4)*, 526 F. App'x 135, 140–41 (2d Cir. 2013) (summary order) ("[M]uch of the evidence relied on by the SRO to support his view that the IEP was adequate was 'retrospective testimony.' For example, the SRO concluded that the IEP provided adequate speech and language therapy in large part because the teacher in S.K.'s proposed placement classroom testified that she provided frequent language instruction in the form of gestures, picture symbols, and sign language. This testimony may accurately reflect the care and individual instruction that would be available to S.K. at her proposed placement, but it has no bearing on the evaluation of S.K.'s IEP. For the reasons discussed in *R.E.*, neither the state review

28

officers nor our Court may justify the CSE's IEP based on evidence about the language services S.K. would *actually* receive in her public school placement. Parents are entitled to rely on the IEP for a description of the services that will be provided to their child."). Although the District Court attempted to distinguish this case from our long line of cases barring retrospective testimony because K.T. was actually educated at the IEP placement, this is a distinction without a difference. Moreover, although we have previously allowed testimony "that explains or justifies the services listed in the IEP," *R.E.*, 694 F.3d at 186, this exception is not applicable here. Ms. Quinones's testimony indicated that K.T. was receiving speech-language acquisition in the classroom, a service that was not provided for in the IEP. This testimony, however, does not further explain a service provided for in the IEP, but rather explains a new service not noted therein. Accordingly, although her testimony may accurately reflect the services received in the classroom, it has no bearing on the evaluation of K.T.'s IEP.

Further, although we have not previously considered whether failure to comply with the speech-language therapy provision for students with autism might rise to the level of a FAPE deprivation, we are of the view that such an inadequacy constitutes a serious violation of the procedures of the IDEA. This is because central to the provision of a student's special education is his or her communicative functioning, including speech and language instruction. Although the December 2009 IEP listed K.T.'s speech and language levels and deficiencies with some detail and provided annual goals and short-term objectives for K.T. to progress in these areas,[16] these provisions

---

[16] For example, the December 2009 IEP provides an annual goal of "develop[ing K.T.'s] reading skills with 80% accuracy" and short-term

did nothing to compensate for the CSE's failure to mandate the proper frequency with which he was to receive speech and language instruction and more individualized learning in a smaller classroom setting. Put differently, these provisions did not compensate for the lack of (as much as) four hours of weekly instruction to which K.T. was legally entitled but did not receive during the 2009–2010 school year. Moreover, this violation is underscored by the fact that, in at least the prior two IEPs developed for K.T. in December 2007 and December 2008, he was provided with the same infrequent weekly instruction in violation of New York law, further limiting any progress he might have made with his speech in prior years. Further stressing the importance of the speech-language provision in this case is that K.T. possesses "a cognitive linguistic level of approximately 3.6 years," that is, less than a four-year-old. *See* IHO Hearing Tr. 392. His teacher, Ms. Quinones, also testified that K.T. did not "know any letter sounds." IHO Hearing Tr. 172. Thus, the record demonstrates that further speech language therapy in a smaller class setting is precisely what K.T. required in order to progress.

Accordingly, the DOE's procedural error in this case was a serious one and, contrary to the findings of the District Court, was not rehabilitated in the IEP by other provisions made by the CSE. The procedural error thus deprived K.T. of important educational benefits to which he was entitled by law.

---

objectives, such as "read[ing] and identify[ing] items he likes from a fast food menu 8/10 times over a two week period," and "look[ing] at a picture book for enjoyment during a choice reading time 8/10 times over a two week period." Pl.'s Ex. 6 at 6.

### 2. *December 2010 IEP's Speech-Language Provision*

On December 8, 2010, the New York regulation governing speech-language therapy for students with autism was amended to remove the daily speech-language instruction and the minimum class-size requirements, imposing upon the DOE only that "[i]nstructional services shall be provided to meet the individual language needs of a student with autism." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(4). The December 2010 IEP, which provided for the same speech-language instruction as the December 2009 IEP and was formulated on December 20, 2010, after the new version of the regulation became effective, thus was in conformity with the speech-language therapy regulation. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(4).

Although the frequency of speech-language instruction in the December 2010 IEP was in conformity with the law, L.O. contends that this level of recommended instruction was not reasonably calculated to deliver K.T. educational benefits and thus deprived him of a FAPE. According to L.O., the CSE should have increased K.T.'s speech services in the December 2010 IEP, given that K.T. possessed the language skills of a three-year-old.

A comparison of the speech-language services provided for in the December 2009 and December 2010 IEPs reveals that they are substantially similar. The SRO observed that progress updates between January 2010 and November 2010 showed that K.T. had made progress on his goal in the December 2009 IEP of socially conversing with his peers and adults, as well as his social interaction goal of improving his receptive language skills. The SRO also found that K.T. had met a short-term objective, which was improving his ability to play board games. Based on this progress, the SRO determined that the CSE reasonably continued K.T.'s annual goals and short-term objectives

contained in the previous IEP (i.e., the December 2009 IEP), which adequately addressed K.T.'s speech-language needs.

We are not persuaded, based on the record before us, that these services adequately addressed K.T.'s needs. Ms. Quinones testified before the IHO that K.T. knew no letter sounds and was able to identify only some letters of the alphabet. Despite this observation, Ms. Quinones stated that she did not work with K.T. to improve his ability to make letter sounds during any of the school years challenged in this action. Moreover, when pressed on the issue, Ms. Quinones testified that she believed such learning was unnecessary because K.T. had "reach[ed] a plateau" because he was unable to "retain information," so she "move[d] on to functional independent skills." IHO Hearing Tr. 172, 173. Further, consistent with Ms. Quinones's testimony was that of Charlene Torres, the DOE's speech therapist who worked with K.T., who testified at the IHO hearing that she did not address K.T.'s language deficiencies; rather, she focused exclusively on goals related to his social interaction with others. Ms. Torres further acknowledged that K.T.'s vocabulary was extremely restricted, limited often to "yes" and "no" answers. IHO Hearing Tr. 372. Moreover, K.T.'s Medicaid Service Coordinator, Peter Doran, testified that, since he had begun working with K.T. in 2009, he believed that K.T. "ha[d] made no progress" with his speech, which had "stayed the same." *See* IHO Hearing Tr. 624.

We are mindful, of course, that how best to educate an autistic child is "a difficult question of educational policy" that requires deference to the decisions of administrative experts. *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009). Based on the record, however, it appears plain that, contrary to the findings of the SRO, the speech-language services set forth in the December 2010 IEP—which were

substantially similar to those contained in the December 2009 IEP—were not adequately designed to address and improve K.T.'s speech-language needs. Indeed, IHO hearing testimony from Carol Bufano, a former DOE related services coordinator responsible for ensuring that students received the services provided for under the terms of their IEPs, suggested that the speech-language services offered at K.T.'s placement school were generally applicable to all students and not narrowly tailored to K.T.'s particular needs. Although K.T. may have enjoyed limited progress in achieving certain social interaction goals from the prior IEP, the hearing record reflects that K.T.'s speech-language skills had not improved and that he continued to suffer from an almost complete inability to communicate verbally with others.

The SRO's conclusion that the CSE reasonably carried over from the prior IEP the twice weekly speech-language services in groups of three thus was error. It is clear that K.T.'s verbal communication skills were not improving under this provision, yet no attempt to provide further out-of-class speech-language therapy was provided for in the IEP. Indeed, it is not surprising that K.T. did not progress given that his IEPs did not call on his instructors to attempt to work with him on actually improving his speech. Thus, although the speech-language therapy services provided for in the IEP no longer violated minimum requirements under the law, the limited and generally applicable therapy sessions contained in the December 2010 IEP were not reasonably calculated to provide K.T. with educational benefits.

### 3. March 2011 IEP's Speech-Language Provision

In reviewing L.O.'s challenge to the speech-language instruction provided for in the March 2011 IEP, the SRO observed that the description of K.T.'s speech-language needs,

annual goals, and short-term objectives remained unchanged from the prior IEP formulated just three months earlier. It thus concluded that the recommended continuation of the two thirty-minute speech-language therapy sessions in groups of three was reasonable. This was error. Given that K.T.'s speech-language needs remained unchanged from the prior IEP, we continue to find these provisions inadequate because they were unlikely to result in any progress in K.T.'s speech. Indeed, prior to the formulation of the March 2011 IEP, a Vineland-II Survey Interview Report was generated for K.T. on March 7, 2011, which determined that K.T.'s communication skills placed him below one percentile. A preponderance of the evidence demonstrates that K.T. was still in need of greater support services in his learning environment related to his speech-language capabilities in March 2011.

## D. Goals and Objectives

The IDEA requires that a student's IEP include "a statement of measurable annual goals, including academic and functional goals, designed to . . . enable the child to . . . make progress" and "meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa) & (bb). "New York State regulations require an IEP to specify 'evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal.'" *M.H.*, 685 F.3d at 249 (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii)(b)). Further, "[a]ny short-term objective must also be 'measurable.'" *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii)(c), (iv)). We generally have held, however, that "[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346

34

F.3d 377, 382 (2d Cir. 2003). L.O. maintains that the goals in the IEPs were inadequate because they failed to address K.T.'s pica, toileting issues, and communication deficiencies. Thus, for L.O., because the goals set forth in each IEP failed to address K.T.'s educational needs, the IEPs were procedurally inadequate and K.T. was deprived of a FAPE.

### 1. December 2009 IEP's Goals and Objectives

First, although the SRO made no findings with respect to K.T.'s pica, the 2009 IEP identified K.T.'s behavioral deficiency, noting his "self-abusive behaviors such as . . . eating staples." Pl.'s Ex. 6 at 4. The IEP further provided that, as a result, K.T. "must be observed consistently." Pl.'s Ex. 6 at 4. Indeed, in the BIP developed for K.T. as part of the 2009 IEP, it described his pica (i.e., "eating staples"), and then listed as an expected behavioral change that he "w[ould] engage less frequently in self-abusive behaviors," and that such a change would be achieved through a number of strategies, such as "constant positive reinforcement" from his "classroom paraprofessionals" and providing rewards and consequences for positive and poor behavior. Pl.'s Ex. 6 at 16. Like the District Court, we are mindful that the IEP did not include annual goals or short-term objectives specifically related to K.T.'s pica, nor did it include the frequency with which K.T.'s progress would be reported by the DOE, but we nonetheless conclude that there is nothing in the record to indicate that these omissions prevented K.T. from making progress in this area or deprived him of a FAPE. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa).

Next, with respect to K.T.'s toileting needs, evaluative data, including a September 2009 psychosocial evaluation report, stated that K.T. "need[ed] assistance in bathing and cleaning himself after using the toilet." Pl.'s Ex. 27 at 3. L.O. further testified before the IHO that toileting was an issue with which

35

K.T. required assistance because "he urinate[d] all over the seat" and "d[id not] clean himself" after bowel movements. IHO Hearing Tr. 680. According to L.O., K.T. struggled using the toilet alone because "[h]e ha[d] no eye coordination" and was "not able to focus on the task at hand." *Id.*

Although the December 2009 IEP did not specifically address K.T.'s toileting needs, the District Court observed that it did include an annual goal that K.T. "w[ould] improve [his] fine motor skills necessary for performing ADL [(i.e., activities of daily living)] and [s]chool activities," which "w[ould] be assess[ed] within a year." Pl.'s Ex. 6 at 10. In addition, consistent with L.O.'s testimony, K.T.'s BIP identified the interfering behaviors noted in the psychosocial evaluation report as causing his toileting issues, noting that K.T. "ha[d] significant difficulties paying attention and maintaining concentration." Pl.'s Ex. 6 at 16. The BIP further provided that it expected to "improve[] [his] attention and concentration" with "ongoing support from classroom paraprofessionals" by rewarding K.T. for exhibiting positive behavior and punishing him for undesirable conduct. Pl.'s Ex. 6 at 16. Thus, although the IEP failed to provide goals and objectives specifically related to K.T.'s toileting needs, it nonetheless designed goals that would enable K.T. to make progress in this area.

Further, the December 2009 IEP adequately identified goals and strategies for K.T.'s communication deficits, providing, for example, that, "[i]n a year[,] [K.T.] w[ould] give eye contact with familiar peers while transitioning from one place to the other four out of five times over a three-week period. Pl.'s Ex. 6 at 11. As an annual goal, the IEP provided that, "[i]n [a] one year period[, K.T.] w[ould] be able to initiate social conversation with peers, family members or other staff members in his envi[ronment]," which "w[ould] be monitored by

observation and class activities four out of five times over a two week period." Pl.'s Ex. 6 at 11. Moreover, the IEP provided that "[w]ithin a year, [K.T.] w[ould] increase his social interaction skills with 80% accuracy as measured by teacher made activities." Pl.'s Ex. 6 at 8. Toward reaching this goal, the IEP provided short-term objectives, which included "play[ing] board games with other students 8/10 times over a two week period," "properly set[ting] a dinner table and identify[ing] all necessary utensils 8/10 trials over a two week period," and "distribut[ing] classroom materials to his fellow peers and participat[ing] in other classroom job activities 8/10 trials over a two week period." Pl.'s Ex. 6 at 8. The IEP thus contained goals and objectives for skills related to reading, handwriting, community awareness, and social interaction. We "defer[] to the expertise of the administrative officers" over whether these goals and objectives were sufficient. *See Grim*, 346 F.3d at 382.

Accordingly, we affirm the SRO's conclusion that the goals and objectives set forth in the December 2009 IEP adequately addressed K.T.'s needs and provided sufficient procedures for measuring his progress.

### 2. *December 2010 IEP's Goals and Objectives*

K.T.'s December 2010 IEP provided seven distinct annual/long-term goals and eighteen short-term objectives. As to K.T.'s pica, although a 2010 Association for Retarded Children ("AHRC") psychological evaluation noted K.T.'s pica diagnosis, observed that K.T. continued to "put[] staples in his mouth," and recommended that K.T. "continue to receive treatment for symptoms related to PICA," notably absent from the December 2010 IEP is any goal or objective related to improving this behavioral deficiency. Pl.'s Ex. 25 at 2, 7. Indeed, the BIP incorporated into the December 2010 IEP described K.T.'s "eating staples" as a behavior that interfered with learning, yet

37

the CSE took no further steps to address this condition in the IEP. *See* Pl.'s Ex. 5 at 14. The CSE thus erred in this respect.

As to toileting, however, a September 17, 2010 student strengths-based profile noted under K.T.'s activities of daily living that K.T. is "independent" with respect to "toileting." Pl.'s Ex. 46 at 1. This is the only evaluative material on the record regarding K.T.'s toileting needs at the time the December 2010 IEP was formulated. Accordingly, to the extent that L.O. challenges the adequacy of the December 2010 IEP based on the absence of goals and objectives related to toileting, that challenge is without merit, as the only information of which the CSE could have been aware indicated that K.T. was, by December 2010, able to manage his toileting needs independently.

Further, the December 2010 IEP provided annual goals addressing K.T.'s communicative deficiencies, which included, among other things, "be[ing] able to use the keyboard on a computer to type his name with minimal assistance as measured by [a] teacher with minimal prompting within a two week period . . . using data collection and observation every 2 weeks," and "be[ing] able to comply and cooperate in OT [(i.e., occupational therapy)] activities with use of self-calming and relaxation techniques with 2-3 verbal and visual demonstrations 4 out of 5 opportunities," the progress of which "w[ould] be measured by [K.T.'s] therapist's observation every 4 months." Pl.'s Ex. 5 at 7, 9. As to short-term objectives related to improving his communication skills, the SRO observed that the IEP provided, among other things, (1) that K.T. "w[ould] be able to identify and exchange items needed during an activity with another student by giving and/or receiving objects given visual prompting and verbal cues, 4/5 trials within a 2 week period," (2) that K.T. "w[ould] take turns appropriately in a group activity by verbalizing 'my turn,' with visual cues and prompts

38

when needed, in 4/5 trials, within a 2 week period," which would be assessed "through data collection and observation from teacher" and "evaluated at each marking period," (3) that K.T., "[w]hen shown a picture of a classmate, during a group activity, . . . w[ould] go over to that student and greet them by shaking their hand, with prompting and verbal cues, in 4 trials, within a 2 week period," assessed "through data collection from [the] teacher" and "evaluated at each marking period," and (4) various objectives related to improving his typing skills, such as learning to type the letters of his name. Pl.'s Ex. 5 at 6, 7. The SRO concluded that these annual goals and short-term objectives appropriately and adequately addressed K.T.'s needs, and we defer to its analysis.

Although the IEP is wanting of any annual goals or short-term objectives related to improving K.T.'s pica, this omission did not deprive K.T. of a FAPE. Accordingly, the SRO's determination is affirmed.

### 3. March 2011 IEP's Goals and Objectives

As to the March 2011 IEP's goals and objectives, the SRO observed that K.T.'s needs related to occupational and physical therapy did not change between the formulation of the December 2010 and March 2011 IEPs and thus concluded that the goals carried over from the December 2010 IEP "continued to be appropriately linked to the information reflected in the March 2011 IEP." App. 57. Although the March 2011 IEP provided for individual physical and occupational therapy services for K.T. twice each week for thirty minutes and included three annual goals and nine short-term objectives, which it carried over from the December 2010 IEP, it did not carry over the goals and objectives related to K.T.'s occupational and physical therapy included in the December 2010 IEP. These omissions included annual goals and short-term objectives of teaching K.T. how "to

39

tie his shoes," and "develop[ing] his overall aerobic fitness level" by using a stationary bicycle and working on "ball-related game activities." Pl.'s Ex. 5 at 8, 9. These goals were omitted despite the absence of any record evidence that, between the formulation of the December 2010 IEP and the CSE meeting convened in March 2011, a period of approximately three months, K.T.'s needs related to these areas somehow dissipated or changed. Indeed, the SRO made this observation, yet did not explain it further.

The District Court made this observation and also noted that the March 2011 IEP did not indicate the frequency with which the DOE would report on K.T.'s progress during the 2011–2012 school year, and found that these omissions amounted to a procedural violation of the IDEA, but "that this procedural violation did not deny K.T. a FAPE" because the March 2011 IEP "include[d] a transition plan—which was carried over from the December 2010 IEP—that set[] goals relating to K.T.'s functional and occupational skills." *L.O.*, 94 F. Supp. 3d at 559. The District Court pointed to transition services, including teaching K.T. (1) to "use supermarket circular[s] to choose items to be bought," (2) "community signs for use in the community with adult supports," (3) "work task activities such as sorting and matching," and (4) "functional skills activities such as[] setting the table, [and] washing/drying dishes," which it found "appropriately address[ed] K.T.'s occupational and physical needs." *Id.* (first, second, and third alterations in original) (internal quotation marks omitted).

It is difficult to see, however, how these transitional services, which pertained only to K.T.'s occupational therapy needs, could have rehabilitated the otherwise deficient IEP, given that these goals had no relevance to the physical therapy goals that the District Court acknowledged were missing and

40

amounted to a violation of the procedures of the IDEA. That is, although the transition plan did provide other objectives related to K.T.'s occupational therapy needs in the March 2011 IEP, it provided no objectives related to K.T.'s physical therapy needs, which were well documented in the prior IEP and, based on the information available to the CSE at the time, had not been resolved. Moreover, the March 2011 IEP suffers from the same deficiency as its predecessor (i.e., the December 2010 IEP), as it failed to provide for any treatment of K.T.'s pica. Indeed, there was no new evidence or reports that this condition somehow dissipated since K.T.'s 2010 AHRC psychological evaluation. Further, as the District Court observed, the March 2011 IEP provided no indication regarding the frequency with which the DOE would report on K.T.'s progress in reaching his goals during the 2011–2012 school year, in violation of New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii)(b).

As to K.T.'s toileting, the SRO observed that a March 2011 teacher evaluation prepared prior to the March 2011 CSE meeting indicated that K.T. was independent in all activities of daily living, including toileting. Thus, the SRO reasonably determined, based on this evidence, that no provision was needed to address this condition in the IEP. Further, given the SRO's conclusion that K.T.'s needs remained unchanged between the formulation of the December 2010 and March 2011 IEPs, and that the March 2011 IEP carried over the goals and objectives related to improving K.T.'s communicative skills, which we have already sustained, we continue to find that these goals and objectives were appropriate.

Accordingly, because (1) the March 2011 IEP failed to provide procedures toward meeting important goals such as any related to K.T.'s physical therapy needs and improving his pica, that is, it failed to provide these goals at all in the IEP, (2)

41

omitted, without explanation, various goals related to K.T.'s occupational therapy needs, and (3) failed to indicate the frequency with which K.T.'s progress in reaching his goals would be reported during the school year, this constituted a procedural violation of the IDEA. Although the IEP was wanting of any goals related to K.T.'s physical therapy needs, because he continued to receive weekly and individual physical therapy related services under the terms of the IEP and therefore was not deprived of physical therapy services for the 2011–2012 school year, we conclude that K.T. was not deprived of a FAPE as a result of these procedural errors.

### E. Parental Counseling and Training

Next, L.O. argues that the DOE's failure to provide for parental counseling and training in each of K.T.'s IEPs denied K.T. a FAPE. For educational programs for students with autism, New York requires that an IEP include a "[p]rovision . . . for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d). The purpose of this provision is to "assist[] parents in understanding the special needs of their child; provid[e] parents with information about child development; and help[] parents to acquire the necessary skills that will allow them to support the implementation of their child's [IEP]." *Id.* § 200.1(kk). We have repeatedly held, however, that parental counseling and training omissions are "less serious" procedural violations "because the presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the [IEP]." *See M.W.*, 725 F.3d at 141 (internal quotation marks omitted); *see also R.E.*, 694 F.3d at 191 ("[T]he failure to include parent counseling in the IEP is less serious than [other procedural violations]."). "Moreover, because school districts are

required . . . to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP." *R.E.*, 694 F.3d at 191 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d)). Further, where, as here, the parent enrolls his or her child in the proposed IEP placement, the "[p]arent[] can file a complaint at any time if they feel they are not receiving this service" to rectify the error committed during the drafting of the IEP. *Id.*

Here, the SRO found that each IEP lacked provisions for parental counseling and training and thus violated New York law, which required that such services be provided for in the IEP. The DOE, however, provided evidence that parental services were available at K.T.'s school in the form of monthly family nights and parent workshops, of which L.O. was aware. The SRO, however, refused to consider this evidence because it constituted retrospective evidence and thus could not be used to rehabilitate the IEP. It further noted that, in any event, these services were "general in nature" and not narrowly tailored to K.T.'s severe disabilities. *See* App. 59. Nonetheless, the SRO concluded that the omission of parental counseling and training in the IEPs did not amount to a denial of a FAPE for K.T.

We defer to the SRO's analysis and find that L.O. has failed to specify how the omission of parental training and counseling in K.T.'s IEPs deprived him of a FAPE. We add only one further comment, which is that our retrospective testimony bar should not have prevented the SRO from considering the counseling and training services available to parents at K.T.'s school as part of its determination. "Because New York requires these counseling and training services to be provided even if not listed in an IEP, testimony that such training would be provided does not propose to modify an IEP in such a way as to warrant application of our retrospective testimony bar." *F.L. ex rel. F.L. v.*

43

*N.Y.C. Dep't of Educ.*, 553 F. App'x 2, 7 n.3 (2d Cir. 2014) (summary order).[17] Thus, while its absence in the IEPs constitutes a violation of the procedures of the IDEA, evidence that K.T.'s school actually offered parental counseling and training services could be considered as part of the evaluation of whether the procedural violation deprived him of a FAPE.

### F. Cumulative Effect

We have previously held that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190. The District Court concluded, despite finding multiple procedural violations, that these errors, together, did not deny K.T. a FAPE. We disagree and find that, at a minimum, the errors we have identified in each IEP cumulatively resulted in a denial of a FAPE for K.T. for the 2009–2010, 2010–2011, and 2011–2012 school years.

There were four procedural violations present in each of the three IEPs, three of which we identified as serious errors in formulating K.T.'s public school program. First, there was no record evidence that the CSE reviewed any evaluative materials in developing any of K.T.'s IEPs. This was a clear violation of the IDEA and its implementing regulations, and it raised serious questions about the CSE's review of K.T.'s needs and the adequacy of its determinations in reaching the terms of the IEPs. *See* 20 U.S.C. § 1414(c)(1)(A); 34 C.F.R. § 300.324(a)(1)(iii). Second, the CSE failed to conduct an FBA for any of the IEPs,

---

[17] "[D]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (internal quotation marks omitted).

despite finding that K.T. possessed behaviors that interfered with learning, which this Court has previously found to constitute "a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all." *R.E.*, 694 F.3d at 190. Indeed, that is the case here, as this failure resulted in the omission of "global and specific hypotheses as to why [K.T.'s] problem behavior[s] occur[red]," which are minimum requirements under the law. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(mmm). In other words, the CSE, in formulating K.T.'s IEPs, developed BIPs without the results of an FBA, and thus never attempted to address the root causes of K.T.'s interfering behaviors, thereby casting doubt on the adequacy of its provisions for treating them. *See id.* Third, each IEP provided K.T. with insufficiently frequent weekly speech-language instruction in an inappropriate class size. The December 2009 instruction violated the plain language of the New York speech-language provision for autistic students then in effect. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(4) (amended Dec. 8, 2010). In connection with this holding, based on the hearing record, we observed that K.T.'s verbal communication skills were not improving under these services in prior IEPs and found that the continuation of these same services in subsequent IEPs (i.e., the December 2010 and March 2011 IEPs) was not reasonably calculated to improve K.T.'s speech and ability to communicate, which is an integral component of a child's education. Fourth, although a lesser violation, no parental counseling and training was provided for in any of the IEPs, which is a violation of New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d).

We also found additional isolated deficiencies in the IEPs, including the omission of any annual goals or short-term

45

objectives related to addressing K.T.'s pica in the December 2010 and March 2011 IEPs, despite record evidence that K.T. continued to suffer from this condition, a violation of the IDEA's procedures. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii). Further, in addition to the absence of an FBA, no BIP was developed in accordance with the terms of the March 2011 IEP and as required by law, further undermining the SRO's conclusion that K.T.'s interfering behaviors were adequately addressed in the IEP. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b). Moreover, no annual goals or short-term objectives were included in the March 2011 IEP related to K.T.'s physical therapy needs—despite their inclusion in his IEP just three months earlier and without any record evidence suggesting that his physical therapy needs had dissipated or somehow changed between the formulation of his IEPs in December 2010 and March 2011—and no provision was made indicating the frequency with which K.T.'s progress in reaching any of his goals would be reporting during the school year. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii)(b). Indeed, we are left to wonder whether these persistent errors and omissions in developing K.T.'s IEPs are the result of the CSE's failure to consult the evaluative materials available to it at the time.

There is no doubt that these procedural violations in formulating each IEP, when taken together, deprived K.T. of a FAPE for each school year.[18] The DOE displayed a pattern of indifference to the procedural requirements of the IDEA and

---

[18] Because we conclude that these violations cumulatively deprived K.T. of a FAPE for the 2009–2010, 2010–2011, and 2011–2012 school years, we express no view as to whether any of these violations, when considered individually, amount to a denial of a FAPE.

carelessness in formulating K.T.'s IEPs over the period of many years, repeatedly violating its obligations under the statute, which consequently resulted in the deprivation of important educational benefits to which K.T. was entitled by law. *See R.E.*, 694 F.3d at 194. The District Court denied L.O. relief on the basis that the deficiencies identified in the IEPs were "more formal than substantive." *L.O.* 94 F. Supp. 3d at 571 (internal quotation marks omitted). We have explained, however, that "[t]he initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" *A.C.*, 553 F.3d at 172 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)). Accordingly, we reverse the judgment of the District Court and remand the case for further proceedings.

## II.    RELIEF

Last, we turn to the issue of relief. Under the IDEA, "a handicapped child does not have a right to demand public education beyond the age of twenty-one." *Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988), *vacated on other grounds sub nom. Sobol v. Burr*, 492 U.S. 902 (1989), *reaff'd*, 888 F.2d 258 (2d Cir. 1989). Here, L.O. retrospectively challenges the adequacy of the public school placement K.T. attended for three years, claiming that it did not provide him with a FAPE. In doing so, however, L.O. seeks relief that would undoubtedly extend beyond K.T.'s twenty-first birthday.[19]

We are directed by statute that, "[i]n any action brought under the IDEA, the court 'shall grant such relief as the court

---

[19] As noted, K.T. will celebrate his twenty-first birthday on October 23, 2016.

determines is appropriate.'" *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)), *cert. denied*, No. 15-1159, 2016 WL 1059911 (U.S. May 16, 2016). Courts retain broad discretion in fashioning an award, restrained only by the Supreme Court's directive that "the relief is to be 'appropriate' in light of the purpose of the Act." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985); *see also Doe*, 790 F.3d at 454. The Supreme Court has held that "equitable considerations are relevant in fashioning relief" in any IDEA action. *See Burlington*, 471 U.S. at 374; *see also Doe*, 790 F.3d at 454. Further, although "[a]n award of damages is not available, . . . a court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies." *Doe*, 790 F.3d at 454 (citing *Burlington*, 471 U.S. at 369; *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir. 2002)). The parties contest what relief, if any, is available to L.O. under the unusual circumstances of this case. Neither the District Court nor either administrative officer, however, reached this question below. Accordingly, on remand, the District Court is directed to consider, in the first instance, what, if any, relief L.O. is entitled to as an award for K.T.'s FAPE deprivations for the 2009–2010, 2010–2011, and 2011–2012 school years. In doing so, "[w]e leave the mechanics of structuring the compensatory education award to the [D]istrict [C]ourt's sound equitable discretion, although the court may wish to consult remedies that we have endorsed in the past." *Id.* at 457.

## CONCLUSION

We have reviewed the parties' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the District Court is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.