**S.Y. and R.Y., individually, and on behalf of R.Y., Plaintiffs,**

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION and Carmen Fariña, in her official capacity as Chancellor of the New York City Department of Education, Defendants.**

15 Civ. 6277 (AT)

United States District Court, S.D. New York.

Signed September 28, 2016

558

Michele Kule-Korgood, Law Offices of Michele Kule-Korgood, Forest Hills, NY, for Plaintiffs.

Neil Anthony Giovanatti, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

Analisa Torres, District Judge.

S.Y. and R.Y. (together, the "Parents"), individually and on behalf of their child, R.Y., (collectively, "Plaintiffs") bring this action against Defendants, the New York City Department of Education and its Chancellor (together, the "DOE"), pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* (2012).[1] Plaintiffs seek review of the April 9, 2015 decision of New York State Review Officer Justyn P. Bates (the "SRO Op.") reversing the February 15, 2013 decision of Impartial Hearing Officer Susan M. Barbour (the "IHO Op."), which found that the DOE had failed to offer R.Y. a free appropriate public education and directed the DOE to pay for R.Y.'s private school tuition. The parties move for summary judgment. For the reasons stated below, Plaintiffs' motion is GRANTED, and the DOE's cross-motion is DENIED.

## STATUTORY FRAMEWORK

Under the IDEA, New York State must "provide disabled children with a free and appropriate public education ('FAPE')." *R.E. v. N.Y.C. Dep't of Educ.,* 694 F.3d 167, 174–75 (2d Cir. 2012). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education plan ('IEP') for each such child." *Id.* at 175 (citing 20 U.S.C. § 1414(d)). The IEP is a written statement that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *L.O. v. N.Y.C. Dep't of*

---

1. "This opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms. In addition to their definition in the text, a separate glossary of acronyms is therefore set forth in the Appendix to this opinion." *M.H. v. N.Y.C. Dep't of Educ.,* 685 F.3d 217, 223 n.1 (2d Cir. 2012).

*Educ.*, 822 F.3d 95, 102–03 (2d Cir. 2016) (quoting *R.E.*, 694 F.3d at 175). "The IDEA requires that an IEP be 'reasonably calculated to enable the child to receive educational benefits.'" *R.E.*, 694 F.3d at 175 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

 In New York City, the DOE creates an IEP through a local Committee on Special Education (the "CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1) (McKinney, Westlaw through 2016 ch. 240). At a minimum, the CSE is composed of the student's parent, one of the student's special education teachers, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician, and a parent of another student with a disability. *Id.* § 4402(1)(b)(1)(a). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175.

The IEP does not necessarily specify a particular school. *See T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). "The [DOE]'s practice is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation, or FNR identifying a specific school at a later date. The parents are then able to visit the placement before deciding whether to accept it." *R.E.*, 694 F.3d at 191.

 If a parent believes that the DOE has breached its obligations under the IDEA by failing to provide the student with a FAPE, the parent "'may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a

'due process complaint.'" *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (per curiam) (quoting *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014)). The due process complaint initiates administrative proceedings involving a hearing before an impartial hearing officer ("IHO"). *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4404(1)). "Either party may then appeal the case to the state review officer ('SRO'), who may affirm or modify the IHO's order." *Id.* (citing N.Y. Educ. Law § 4404(2)).

 The administrative proceedings are governed by a three-pronged framework known as the *Burlington/Carter* test. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). As implemented by New York law, this test allocates to "the local school board ... the initial burden of establishing the validity of its plan at a due process hearing. If the board fails to carry its burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184–85 (footnote omitted) (citing N.Y. Educ. Law § 4404(1)(c)). Any party aggrieved by the SRO's final administrative decision has the right to seek further review by bringing a civil action in state or federal court. *Id.* at 175 (citing 20 U.S.C. § 1415(i)(2)(A)).

## BACKGROUND

### A. R.Y.'s 2012-2013 IEP and Placement

The factual background of this case is largely undisputed. R.Y. is a sixteen-year-old student diagnosed with autism. *See* Pl. Mem. 1, ECF No. 19; Def. Mem. 2, ECF No. 21; Ex. 6 at 6.[2] R.Y. faces developmen-

---

**2.** Citations to exhibits ("Ex.") and the transcript ("Tr.") refer to the record of proceed-

ings before the IHO. The Parents' exhibits are designated by letters, and the DOE's by num-

tal impairments in visual and spatial tracking, focusing, social and language skills, and motor coordination. Tr. 137-38. In the 2011-2012 school year, when R.Y. was twelve years old, she was reportedly working at a prekindergarten level. Tr. 138. R.Y. had previously attended both public and private schools but, for the previous six years, had been attending the Rebecca School, a specialized private school. Pl. Mem. 3. The Rebecca School utilizes a methodology known as the Developmental, Individual Difference, Relationship/Floortime ("DIR") model. *Id.* at 2–3.

On May 31, 2012, the DOE held a meeting of the CSE in order to formulate an IEP for R.Y.'s 2012-2013 school year. Def. Mem. 2. The CSE members in attendance were R.Y.'s father ("Mr. Y."); Craig Czarnecki, Ph.D., serving as a DOE school psychologist as well as the DOE district representative; Lindsay Dalkin, a DOE special education teacher; Michelina Leone-Flick, a DOE social worker; Rebecca Lubin, R.Y.'s teacher at the Rebecca School; and Lynne Kalvin, a social worker at the Rebecca School. *Id.* at 2–3. In anticipation of the CSE meeting, the DOE had completed a social update evaluation of R.Y. in October 2011 and a psychoeducational evaluation in November 2011. *Id.* at 3. The Rebecca School submitted its own progress report in December 2011, and Dr. Czarnecki conducted a classroom observation of R.Y. in January 2012. *Id.*

Based on their review of these materials and the input of the CSE members, the CSE created the 2012-2013 IEP, which recommended that R.Y. be placed in a twelve-month specialized school and, further, in a special education class with six students, one special education teacher, and one paraprofessional, commonly referred to as a "6:1:1" or "6:1 + 1" ratio. *Id.* at 4; Ex. 2 at 12-13. The IEP also recommended a variety of related services, in-

cluding speech-and-language therapy, occupational therapy, physical therapy, and counseling. Def. Mem. 4; Ex. 2 at 12. Finally, the IEP contained a set of goals and short-term objectives designed for R.Y.'s upcoming school year. Def. Mem. 4; Ex. 2 at 4-11.

On June 18, 2012, having reviewed the IEP's recommendations, the Parents wrote to the DOE about their concerns with the IEP and stated that they would be reenrolling R.Y. in the Rebecca School for the start of the upcoming school year. Ex. D at 1. In a final notice of recommendation ("FNR") dated that same day, the DOE informed the Parents that R.Y. would be placed in a 6:1:1 special education classroom at a specialized public school identified as P053K @ I088K ("P053K"). Ex. 3 at 1. The FNR did not identify a particular classroom at P053K. *See id.* The Parents visited P053K on two occasions: once on June 25 and again on July 9. *See* Def. Mem. 5. On July 2, 2012, the first day of the new academic year, *see* Ex. 2 at 1, the Parents filed a due process complaint, triggering New York's administrative review of the IEP, *see* Def. Mem. 5; Ex. A at 1.

### B. IHO Hearing and Opinion

The assigned IHO, Susan M. Barbour, held a hearing on eight nonconsecutive dates ranging from July 16 to December 19, 2012. IHO Op. 1-2. The IHO issued her decision on February 15, 2013. *Id.* at 17. The Parents raised a number of procedural and substantive challenges to the IEP. In analyzing the first prong of the *Burlington/Carter* test, the IHO found that none of the alleged procedural deficiencies was significant enough to invalidate the IEP. *Id.* at 11–14. However, the IHO determined that the IEP's failure to recommend a one-to-one paraprofessional for

bers. The record materials have been filed with the Court under seal. *See* ECF No. 17.

R.Y. denied her a FAPE. *Id.* at 14. In particular, the IHO observed that R.Y.'s 2011-2012 IEP had recommended such a paraprofessional, and "[t]he DOE has provided no evidence indicating that the student's academic and social emotional needs has so greatly progressed as to eliminate the need for a one-to-one paraprofessional." *Id.* at 14–15. "To the contrary," the IHO found, "with a 6:1:1 program recommendation, considering all of the evidence, in particular the DOE's own psychological evaluation, the student's need for a one-to-one paraprofessional remains." *Id.* at 15.

Having found that the DOE deprived R.Y. of a FAPE for 2012-2013, the IHO turned to the second prong of the *Burlington/Carter* test and found that "the Rebecca [S]chool was appropriate and meets [R.Y.'s] educational needs." *Id.* at 16. Finally, as to the third prong, the IHO concluded that the equities favored R.Y.'s parents and ordered that the DOE provide the funds for R.Y.'s Rebecca School tuition. *Id.* at 16–17.

### C. SRO Opinion

Both parties appealed to New York's State Review Officer, Justyn P. Bates, who issued his decision on April 9, 2015. SRO Op. 23. The SRO affirmed the IHO's decision that none of the alleged procedural deficiencies sufficed to invalidate the IEP. *Id.* at 7–13. But the SRO reversed the IHO's finding that R.Y. had been denied a FAPE because the IEP did not recommend a one-to-one paraprofessional. *Id.* at 17–19. In particular, the SRO found that "the hearing record indicates that the reason for the inclusion of the 1:1 paraprofessional was no longer a concern at the time of the May 2012 CSE meeting." *Id.* at 18. The SRO found evidence that R.Y.'s challenges with distractability and safety awareness had been sufficiently mitigated and that a one-to-one paraprofessional would no longer have been necessary. *Id.* at 18–19. For example, R.Y. reportedly

"exhibited additional skills within her 8:1 + 3 class at the Rebecca School demonstrating readiness for placement in a 6:1 + 1 special class setting." *Id.* at 19. The SRO also rejected the Parents' other substantive challenges. *Id.* at 13–22. Accordingly, the SRO found that the DOE had not denied R.Y. a FAPE, he declined to address the other prongs of the *Burlington/Carter* test, and he found in favor of the DOE. *Id.* at 23.

## DISCUSSION

### A. Standard of Review

█ Although the parties have sought relief from the Court by motions for summary judgment, the "procedure is in substance an appeal from an administrative determination, not a summary judgment." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)). "[T]he motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *Id.* at 225–26 (second and third alterations in original) (quoting *Lillbask*, 397 F.3d at 83 n.3). Accordingly, "a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact." *Lillbask*, 397 F.3d at 83 n.3. Rather, the Court "must base its decision on the preponderance of the evidence." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012).

█ Nevertheless, "federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally Hacks the specialized knowledge and experience neces-

sary to resolve persistent and difficult questions of educational policy.' " *M.H.*, 685 F.3d at 240 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007)). "[C]ourts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.' " *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Nor may the courts make subjective credibility assessments or weigh the testimony of educational experts when the state authorities have already performed these functions. *M.H.*, 685 F.3d at 240. In this way, "the role of federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.' " *Id.* (quoting *Gagliardo*, 489 F.3d at 112).

◼ Where, as here, the IHO and SRO reach conflicting conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246. However, "the deference owed to an SRO's decision depends on the quality of that opinion." *R.E.*, 694 F.3d at 189. Courts may consider "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* (quoting *M.H.*, 685 F.3d at 244). Considering the respective institutional competencies of courts and administrative officers, the SRO's "determinations regarding the substantive adequacy of an IEP should be afforded more weight than the determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244. Additionally, courts should "afford more deference when [their] review is based entirely on

the same evidence as that before the SRO," as is the case here. *Id.* That said, if a court "appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO," the court may instead defer to the IHO's analysis. *Id.* at 246. When seeking to overturn the decision of an SRO, the Parents bear the burden of demonstrating that the decision was insufficiently reasoned or supported. *Id.* at 225 n.3.

## B. Adequacy of the IEP

◼ The first prong of the *Burlington/Carter* test examines the adequacy of the IEP. Within that assessment, there are "[t]wo issues ... relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). The Court first considers the IEP's procedural compliance, which in this case is sufficient to resolve the first *Burlington/Carter* prong in the Parents' favor.

### 1. Procedural Challenges

◼ "The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.' " *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 172 (2d Cir. 2009) (quoting *Walczak*, 142 F.3d at 129). "[H]owever, it does not follow that every procedural error in the development of an IEP renders that

IEP legally inadequate under the IDEA." *Id.* (alteration in original) (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003)). A procedural violation renders the IEP inadequate only when it (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits." 20 U.S.C. § 1415 (f)(3)(E)(ii); *accord L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 109 (2d Cir. 2016). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012). The Court first addresses each individual challenge and then looks to their cumulative effect.

a) Timeliness of Evaluations

 The IDEA requires that each student with a disability be reevaluated "at least once every 3 years." 20 U.S.C. § 1414(a)(2)(B)(ii). The Parents allege, and the DOE does not dispute, that more than three years elapsed between the DOE's May 2008 evaluation of R.Y. and the next evaluation, completed between October 2011 and January 2012. *See* Pl. Mem. 3-4; Def. Reply 9, ECF No. 27. The SRO concluded that the failure to timely reevaluate R.Y. was "a procedural error," SRO Op. 9, but that the CSE nevertheless had sufficient evaluative material—in the form of the untimely evaluations, the Rebecca School report, and the in-person input of the CSE members—to adequately assess R.Y.'s need and to properly formulate the IEP, *id.* at 9–11. The Court defers to the SRO's conclusion and finds, therefore, that the failure to reevaluate R.Y. within the statutory timeline was a procedural violation that is not, on its own, sufficient to invalidate the IEP. *See Scott ex rel. C.S. v.*

*N.Y.C. Dep't of Educ.*, 6 F.Supp.3d 424, 437 (S.D.N.Y. 2014).

b) Timeliness of CSE Meeting

 The IDEA further requires that each child's IEP be reviewed "periodically, but not less frequently than annually." 20 U.S.C. § 1414(d)(4)(A)(i). As with the evaluations, the DOE missed the statutory deadline for reviewing R.Y.'s IEP: by the time of the May 2012 CSE meeting, more than fourteen months had passed since the previous review. Pl. Mem. 4-5. The SRO did not directly address whether this constituted a violation, instead noting that "[a]lthough the May 2012 CSE meeting was held more than one year after the student's prior annual review in March 2011, any delay in developing the student's IEP did not prejudice the student," because the new IEP was in place before the start of the 2012-2013 school year. SRO Op. 12.

The DOE insists that the timing of the 2012 CSE meeting "in no way amounts to a procedural violation." Def. Mem. 10. For support, the DOE cites another provision of the IDEA, which requires districts to have a student's IEP in place "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A). However, the fact that the statute sets one deadline (the start of the next school year) for having the completed IEP in place does not negate the additional deadline (one year) for reviewing that IEP. *Cf. E.H. v. N.Y.C. Dep't of Educ.*, 164 F.Supp.3d 539, 547–48 (S.D.N.Y. 2016) (holding that distinct IEP deadlines are each to be given effect). Accordingly, the Court finds that the DOE failed to meet its IDEA obligation to conduct a timely review of R.Y.'s IEP, but it defers to the SRO's conclusion that this procedural violation alone is not sufficient to invalidate the IEP.

#### c) Additional Evaluations

■ Under the IDEA and implementing regulations, each student with a disability must be evaluated "in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). These areas include, "if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4) (2012). The Parents argue that R.Y.'s IEP was procedurally deficient because the DOE failed to conduct several additional evaluations of R.Y., namely, speech-and-language, occupational, and physical therapy evaluations. These were undoubtedly areas in which R.Y. had a history of disability and in which she had an ongoing need for therapy. *See* Def. Mem. 16; Ex. 2 at 1-3, 12; Ex. 7 at 4-5. Accordingly, the SRO found that the DOE "should have conducted evaluations targeting the student's identified needs with respect to the areas of [occupational therapy], [physical therapy], and speech-language therapy." SRO Op. 11. Nevertheless, the SRO concluded that from the other evaluations and the Rebecca School report the CSE had "sufficient information about the student, including her related services needs, to enable the district to develop an IEP." *Id.* The Court finds, therefore, that the DOE violated the requirements of the IDEA by neglecting to complete evaluations in all areas of suspected disability, but it defers to the SRO's conclusion that this procedural violation alone is not sufficient to invalidate the IEP. *See T.C. v. N.Y.C. Dep't of Educ.,* No. 15 Civ. 3477, 2016 WL 1261137, at *7–8 (S.D.N.Y. Mar. 30, 2016); *C.U. v. N.Y.C. Dep't of Educ.,* 23 F.Supp.3d 210, 230 (S.D.N.Y. 2014).

#### d) Functional Behavioral Assessment

■ The Parents suggest in passing that the DOE should have conducted a functional behavioral assessment ("FBA") to determine whether R.Y. required a behavioral intervention plan ("BIP"). Pl. Mem. 35-36. "New York regulations require the [DOE] to conduct an FBA for a student 'whose behavior impedes his or her learning or that of others.' " *R.E.,* 694 F.3d at 190 (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v)). The IHO found that R.Y. did not exhibit behavior that impeded her or her classmates' learning so as to trigger the need for an FBA. IHO Op. 13. In reviewing the IHO's decision, the SRO did not decide this issue, acknowledging that the evidence was in conflict. SRO Op. 17. The SRO instead concluded that "even if the IHO erred in finding that the student's behaviors did not interfere with learning, the information available to the May 2012 CSE identified the student's behaviors and the 2012-2013 IEP included supports to address them, such that any procedural deficiency did not rise to the level of a denial of a FAPE." *Id.* Because the SRO avoided the question of whether a procedural violation occurred, the Court may look to the IHO decision. *S.B. v. N.Y.C. Dep't of Educ.,* 117 F.Supp.3d 355, 368–69 (S.D.N.Y. 2015). The Parents' conclusory statement that an FBA should have been conducted does not persuade the Court that the IHO erred. Accordingly, the Court defers to the IHO's finding that an FBA was not required, as well as to the SRO's finding that, in any event, the lack of an FBA does not invalidate the IEP.

#### e) Provision of Evaluations

■ The Parents allege that the DOE committed a procedural violation by not providing them with a copy of R.Y.'s psychoeducational evaluation in advance of the CSE meeting. A DOE contractor completed the evaluation in November 2011, more than six months before the May 2012 CSE meeting, and the Parents requested a copy of the evaluation from the contractor. Def

Mem. 19; SRO Op. 12. Although there is some uncertainty as to whether a copy of the evaluation was eventually sent, *see* Def. Mem. 20 (citing Tr. 151), the Parents state they did not receive it, Pl. Mem. 22, and the SRO concluded that "the district did not provide copies of the evaluations to the parents prior to the May 2012 CSE meeting," SRO Op. 12. Deferring to the SRO's factual conclusion, the Court finds that the Parents did not receive the evaluation until Mr. Y. was in the midst of the CSE meeting, at which point Dr. Czarnecki paused the meeting and provided a copy for Mr. Y.'s review. *See* Def. Mem. 20; SRO Op. 12. The IHO did not address this procedural challenge, and the SRO did not expressly state whether the DOE's failure to timely deliver the evaluation was a procedural violation. However, the SRO did conclude that "the [DOE] took appropriate steps to ensure the parents' participation in the CSE meeting and the parents were able to fully participate in the development of the student's IEP." SRO Op. 12.

The Court turns to the question of whether the failure to fulfill the Parents' request for a copy of the evaluation was a procedural violation of the IDEA.[3] The IDEA requires states to afford "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child ... and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1). In New York, the results of educational evaluations "shall be ... forwarded to the [CSE] and the student's parent." N.Y. Educ. Law § 4401–

a(4); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(6)(xii)–(xiii) (Westlaw through Aug. 24, 2016) (requiring districts to "ensure that ... the results of the evaluation are provided to the parents in their native language" and that "a copy of the evaluation report and the documentation of eligibility are provided at no cost to the parent").[4]

■ The Ninth Circuit has explained the "critical nature" of provisions ensuring parental access to evaluations: they safeguard parents' rights to be informed about and involved in the IEP process. *Amanda J. ex rel. Annette J. v. Clark Cty.. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001). The right to examine a district's evaluations undergirds the parents' right to request an independent evaluation if they disagree. *See id.* In order for these rights to be effectuated, they need to be available far enough in advance of the school year for the independent evaluation to be conducted and reviewed by the CSE team. By failing to provide a copy of R.Y.'s evaluation until the May 2012 CSE meeting was already underway, the DOE violated the Parents' right to be involved in the IEP decisionmaking. *See id.* at 892 ("Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA. An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed."). Despite this procedural violation, the CSE took steps to bring Mr.

---

3. Where neither the SRO nor the IHO has spoken on an issue of IDEA procedure, the Court may nonetheless consider it. *See FB v. N.Y.C. Dep't of Educ.*, 132 F.Supp.3d 522, 541 (S.D.N.Y. 2015) ("The relevant facts are not disputed; and the issue at hand does not call upon educational expertise, but instead is a straightforward one of proper procedure which courts are well-equipped to address.").

4. The Court is not persuaded by the DOE's contention that it "is not responsible" for the failure to provide a copy of the evaluation because the evaluation was conducted by (and the Parents requested a copy from) a DOE contractor. Def. Mem. 19. The DOE provides no legal basis for side-stepping its obligations merely because it has contracted out the work of evaluating its students.

Y. up to speed at the time of the meeting. Therefore, the Court will defer to the SRO's conclusion that on its own this violation was not sufficient to invalidate the IEP. *See A.P. ex rel. A.P. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 477, 2015 WL 4597545, at *10 n.7 (S.D.N.Y. July 30, 2015).

### f) CSE Composition

■■ New York law requires that the parent of another student with a disability be present at the CSE meeting. N.Y. Educ. Law. § 4402(1)(b)(1)(a)(viii). The current regulations waive this requirement if the parents do not request the presence of that additional member in advance of the meeting, N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(viii), but the waiver provision was not in effect at the time of the May 2012 CSE meeting at issue here, SRO Op. 8 n.6. The DOE does not dispute, Def. Mem. 25, and the SRO concluded, SRO Op. 8, that the absence of a parent member was a procedural violation. Yet the SRO concluded that because Mr. Y. and representatives from the Rebecca School attended the CSE meeting and actively participated, the absence of the additional parent member did not render the IEP inadequate. *Id.* The Court defers to the SRO's conclusion that the DOE violated the requirements of the IDEA by failing to include an additional parent member but that this violation alone is not sufficient to invalidate the IEP. *See S.W. ex rel. P.W. v. N.Y.C. Dep't of Educ.*, 92 F.Supp.3d 143, 156 (S.D.N.Y. 2015). Nevertheless, the SRO's reasoning does not persuade the Court that the absence of one of the required members was substantially mitigated by the participation of other, equally required members. "If people who could offer meaningful information were not at the meeting, it is impossible to determine whether the provision of that meaningful information would have prompted additional questions from

the parent." *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F.Supp.2d 415, 426–27 (S.D.N.Y. 2007), *aff'd*, 293 Fed.Appx. 20 (2d Cir. 2008) (summary order).

### g) Parent Counseling and Training

■■ "For educational programs for students with autism, New York requires that an IEP include a '[p]rovision . . . for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home.'" *L.O.*, 822 F.3d at 122 (alterations in original) (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d)). This provision was omitted from R.Y.'s IEP, and the SRO found that this was a violation. SRO Op. 22. The Second Circuit has "repeatedly held" that the omission of this required provision is a " 'less serious' procedural violation[ ]" because it does not bear directly on the IEP's substantive adequacy and because the district was required to provide these services whether the IEP called for them or not. *L.O.*, 822 F.3d at 122 (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 141 (2d Cir. 2013)). "[I]n the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement," although the Second Circuit has "emphasized again that even minor violations may cumulatively result in a denial of a FAPE." *R.E.*, 694 F.3d at 191. Accordingly, the Court defers to the SRO's conclusion that this procedural violation alone was not sufficient to invalidate the IEP. *See L.O.*, 822 F.3d at 122.

### h) Prior Written Notice

■■ "The IDEA requires prior written notice to be provided to the parent whenever the district proposes a placement change, while both New York State and federal regulations command that such notice must be provided 'a reasonable time before' any change to placement." *E.H.*,

164 F.Supp.3d at 547–48 (citation omitted) (citing 20 U.S.C. § 1415(b)(3)(A), (c)(1); 34 C.F.R. § 300503(a)(1); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(oo)). Notice is also required whenever the district refuses a parent's proposed placement. *See* 20 U.S.C. § 1415(b)(3)(B). The Eleventh Circuit has explained the purpose of this notice requirement:

> In order for the parents to effectively participate in and contribute to the process of developing an appropriate IEP for their child, they need to know what the school proposes to do and why, and what has been going on with the child at school. Therefore, before a team meeting at which the school district proposes to adopt or amend an individualized education program, the school district must provide the parents with . . . prior written notice . . . .

*K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.,* 741 F.3d 1195, 1203 (11th Cir. 2013). That notice must contain:

> (A) a description of the action proposed or refused by the agency;
>
> (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
>
> . . .
>
> (E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
>
> (F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1); *accord* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(a)(3). The Parents allege that they were denied prior written notice of changes the CSE team adopted and rejected for the 2012-2013 IEP. The parties dispute a number of issues, including whether there was a change in R.Y.'s educational placement

and whether the Parents had written or actual notice of the DOE's decisions.

First, the parties disagree as to whether R.Y.'s previous placement was the 6:1:1 classroom recommended in her 2011-2012 IEP, Ex. R at 1, or the 8:1:3 classroom in which R.Y. was actually enrolled for the year. The transcript of the IHO hearing indicates that R.Y.'s 2011-2012 placement was affected by a settlement between the Parents and DOE, *see e.g.,* Tr. 473-74, the terms of which are not in the record. As described below, the Court need not decide this issue, because both positions result in the same outcome.

■ Second, the parties dispute whether the 2012-2013 IEP's recommendation of a 6:1:1 classroom without a one-to-one paraprofessional was a change from Rebecca's previous educational placement. The IHO did not address this issue, but the SRO did, finding that there was no change in placement. *See* SRO Op. 13. If the previous educational placement was the 8:1:3 classroom, as the Parents contend, even the DOE implicitly agrees that the 6:1:1 proposal would have effected a change. *Cf.* Def. Mem. 23 (suggesting that the relevant inquiry is whether the classroom ratio is the same in each year's IEP). But even if the previous educational placement was the 6:1:1 classroom with a one-to-one paraprofessional recommended by the 2011-2012 IEP, as the DOE contends, the removal of the one-to-one paraprofessional was a change in R.Y.'s educational placement. The Second Circuit has taken a "restrictive interpretation of the meaning of 'educational placement,'" *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Dep't of Educ.,* 629 F.2d 751, 755 (2d Cir. 1980), excluding from its scope, for example, the specific school to which a student is assigned, *id.* at 756. Nevertheless, the Second Circuit has included in that scope "the

classes, individualized attention and additional services a child will receive." *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009); *accord K.L.A. ex rel. B.L. v. Windham Se. Supervisory Union*, 371 Fed.Appx. 151, 154 (2d Cir. 2010) (summary order) (quoting the federal Department of Education's response to rule-making comments at 71 Fed. Reg. 46,540, 46,687 (Aug. 14, 2006)) ("The Department's longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school."). The one-to-one paraprofessional recommended in the 2011-2012 IEP was a related service, *see* Ex. R at 18 (listing the paraprofessional under related services in the IEP), and the removal of that recommendation dramatically decreased the individualized attention offered to R.Y. Accordingly, the Court finds that the 2012-2013 IEP's recommendation of a 6:1:1 classroom without a one-to-one paraprofessional proposed a change to R.Y.'s educational placement sufficient to require prior written notice. The SRO's contrary finding was conclusory and contrary to law; it does not warrant deference.

▬ Third, the Parents allege that they received no written notice of the change proposed to R.Y.'s IEP. They also allege, and the SRO found, that they received no written notice of the DOE's refusal to adopt their proposed placement in an 8:1:3 classroom. SRO Op. 13. The only alleged written notice to which the DOE points is the 2012-2013 IEP itself. Def. Mem. 24. Courts disagree about whether the IEP document can itself serve as prior written notice of the changes it recommends or whether notice is required in advance of the meeting where the IEP is formulated. *Compare GB v. N.Y.C Dep't of Educ.*, 145 F.Supp.3d 230, 248 (S.D.N.Y. 2015) (ruling that no notice is required "because [a student's] placement is up for re-determination every year at the CSE

meeting"), *with K.A.*, 741 F.3d at 1203 (suggesting that written notice is required before the annual CSE meeting). Even if an IEP could in general serve as prior written notice, this particular IEP failed to conform to the IDEA'S notice requirements. It did not so much as mention the one-to-one paraprofessional or the 8:1:3 ratio, much less include an explanation of the district's decisions and the relevant factors as required by the IDEA. Accordingly, the Court finds that the DOE failed to provide written notice of these changes to the Parents and, in doing so, violated the procedural requirements of the IDEA.

Although the SRO did not directly find that there had been a violation with regard to prior written notice, he did hold that any such violation did not result in prejudice to the Parents or R.Y. and, thus, was insufficient to invalidate the IEP. SRO Op. 13. That conclusion was not well reasoned: the SRO merely repeated the language of the statute, without analysis, and then observed that the CSE team considered and rejected 12:1:4, 12:1:1, and 8:1:1 classrooms. *Id.* He did not address the CSE's failure to give notice regarding the one-to-one paraprofessional and the 8:1:3 ratio, and he did not explain how the CSE's consideration of different classroom ratios mitigated this failure. The SRO's reasoning on this issue is, therefore, not worthy of deference. *See C.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 Fed. Appx. 81 (2d Cir. 2014) (summary order)

Unlike the SRO, the Court finds the Parents have shown that they were prejudiced by the DOE's procedural violation. In particular, the DOE failed its statutory and regulatory obligation to share with the Parents its reasoning for rejecting the Parents' proposal and for changing R.Y.'s educational placement. There is no evidence in the record to suggest that this

reasoning was expressed to the Parents other than in writing, such as verbally at the CSE meeting. *See* IHO Op. 14. By leaving the Parents completely in the dark on a matter as fundamental as the reasoning behind R.Y.'s educational placement, the DOE significantly impeded the Parents' opportunity to participate in the decisionmaking and, in turn, denied R.Y. a FAPE.

i) Consideration of Alternate Placement

■ The Parents allege that the CSE failed to consider whether an 8:1:3 classroom, as opposed to the recommended 6:1:1, was necessary in order to confer educational benefit on R.Y. Neither the IHO nor the SRO addressed this issue. Both Mr. Y. and R.Y.'s Rebecca School teacher expressed to the CSE that R.Y. required the support of an 8:1:3 classroom. *See* Ex. 4 at 4; Ex. II at 4. Although the CSE was not required to adopt the Parents' preferred placement, "the CSE had an obligation to consider that [R.Y.] needed a more restrictive ratio, and concede that fact if the [DOE]'s public options were unable to meet [R.Y.]'s needs." *E.H.*, 164 F.Supp.3d at 551–53. The DOE has the initial burden of showing its compliance with the IDEA, but none of the citations it offers substantiates its claim that the CSE gave due consideration to an 8:1:3 classroom. *See* Def. Reply 5. Instead, the DOE points to evidence that the CSE considered ratios of 12:1, 12:1:1, 12:1:4, and 8:1:1, *see, e.g.*, Ex. 4 at 4, and the IEP itself confirms that only these ratios were considered, Ex. 2 at 18 (listing "Other Programs Considered"). Evidence that the CSE considered these other ratios is not responsive to the Parents' allegation that the CSE failed to consider an 8:1:3 ratio. *E.H.*, 164 F.Supp.3d at 551–54.

■ The only evidence that the CSE responded to Mr. Y. and the teacher's 8:1:3 proposal indicates that it was rejected categorically on the ground that the DOE does not offer that ratio in the public schools. *See* Ex. II at 4; Tr. 1256. The IDEA does not permit the categorical rejection of placements outside the public school system. *E.H.*, 164 F.Supp.3d at 551– 53 ("The IDEA does not demand that students with special needs be placed in the best of inappropriate public options..... Likewise, the statute does not require that a parent's view need only be considered if it is consistent with available public offerings."); *see also M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 257 (2d Cir. 2012) (comparing a permissible "decision to rely heavily" on available public placements to an impermissible policy that "the district would not consider [the proposed] placement in an appropriate case"); *R.B. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 6331, 2016 WL 2939167, at *8 (S.D.N.Y. May 19, 2016) (considering whether "the [DOE] categorically rejected the Parents' preferred ratio without due consideration"). The DOE, which carries the burden of proof on this issue, offered no evidence to substantiate its claim that the CSE gave due consideration to an 8:1:3 classroom. Accordingly, the Court finds that the DOE failed in its "obligat[ion] to consider the Parent's point of view that a 6:1:1 placement was not appropriate for [R.Y.] and [8:1:3] was necessary, particularly in light of the fact that [R.Y.] was then being educated in [an 8:1:3] ratio." *E.H.*, 164 F.Supp.3d at 553–54. This procedural violation significantly impeded the Parents' right to participate in the decisionmaking process by failing even to consider their input on a key component of the IEP; in doing so, the DOE denied R.Y. a FAPE. *See id.*

j) School and Classroom Assignment

■ The Parents allege that their procedural rights were violated by (1) the DOE's delay in sending them an FNR identifying the school to which R.Y. would

be assigned and (2) the DOE's failure to share with them the specific classroom in which R.Y. would be placed. Neither the IHO nor the SRO addressed this issue. "[T]he crux of the right to meaningfully participate in the school selection process is the right to 'evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school.'" *FB*, 132 F.Supp.3d at 541–42 (quoting *V.S. ex rel. D.S. v. N.Y.C. Dep't of Educ.*, 25 F.Supp.3d 295, 299 (E.D.N.Y. 2014)). The Parents are correct that the DOE's actions impeded this right. The DOE did not send an FNR until at least June 18, for a school year starting on July 2. This afforded the Parents at most nine business days to schedule and consummate a visit at the proposed school, P053K, which they ultimately did on June 25 and again on July 9, after the start of the new academic year. During the school visits, R.Y.'s mother ("Ms. Y.") was informed by P053K's unit coordinator that it was not possible to identify the specific classroom in which R.Y. would be placed, Tr. 1317-18, despite the fact that the coordinator had known which classroom it would be since at least June 18, *see* Ex. HH at 1.

This case is similar to others in which courts in this district have found that DOE's delay violated the parents' procedural rights. Such violations have been found where, for example, the DOE sent an FNR on June 15 for a school year beginning on July 6, *FB*, 132 F.Supp.3d at 541–43, and on June 18 for a school year beginning on July 5, *C.U.*, 23 F.Supp.3d at 227. "It is unreasonable to expect that a child needing effectively constant adult care could be slotted in to a new class in a new place with new instructors and peers on the notice of a handful of days (at most)." *E.H.*, 164 F.Supp.3d at 548-49. Particularly salient here, as in *FB*, was the need for the Parents to identify and evaluate the particular classroom, teacher, and resources that would be provided to R.Y.

"[T]he information the Parents sought was directly relevant to their ability to assess the proposed placement and its capacity to implement [R.Y.]'s IEP. For example, the IEP required that the school provide [R.Y.] with immediate access to sensory materials, and set out goals that drew upon (and used the terminology) of a particular teaching methodology (that used at the Rebecca School—DIR/Floortime). The Parents understandably sought to assess whether a proposed placement school could implement those aspects of the IEP." *FB*, 132 F.Supp.3d at 543. In sum, "the IEP could not be meaningfully evaluated independent of the proposed placement's ability to implement it." *Id.* at 544. Especially troubling is the DOE's position regarding this issue in the present litigation: the DOE disclaims its responsibility to provide any information beyond a last-minute FNR and school visit, *see* Def. Mem. 15; Def. Reply 11, but then attempts to scuttle the Parents' substantive challenges to P053K as "inherently speculative" and "offer[ing] no hard evidence," *see* Def. Reply 30. The DOE cannot have it both ways. The DOE's right to demand nonspeculative evidence, *see R.E.*, 694 F.3d at 185–88, goes hand in hand with its obligation to provide parents the opportunity to acquire such relevant and timely information.

In delaying the FNR until just days before the start of the school year and in refusing to provide the Parents with information about the classroom to which R.Y. had already been assigned, the DOE impeded the Parents' ability to participate meaningfully in the school selection process. This was a violation of the Parents' procedural rights. Nevertheless, as the DOE points out, the impediment here is less severe than in other cases finding a violation of the same right, where parents were only permitted to visit while school was out of session, *see FB*, 132 F.Supp.3d

at 543, or were denied a school visit entirely, *see C.U.*, 23 F.Supp.3d at 228. Ms. Y. was able to visit the school at the eleventh hour and make preliminary observations. *See* Tr. 1315-37 (describing Ms. Y.'s school visits). Accordingly, the Court finds that this procedural violation alone is not sufficient to invalidate the IEP.

### k) Cumulative Effect

■ In addition to the individual procedural violations they allege, the Parents assert that their right to participate was significantly impeded by the cumulative effect of those violations taken together. "The IHO and SRO erred in neglecting to address this issue." *Scott*, 6 F.Supp.3d at 439. The Second Circuit has recently reminded district courts to take seriously the question of cumulative effect, *L.O.*, 822 F.3d at 123–24, and courts "recognize that a substantive denial of a FAPE may arise from the combination of individually innocuous procedural violations," *Scott*, 6 F.Supp.3d at 440.

Here the Court has identified nine distinct procedural violations, several innocuous but some quite serious. The DOE failed to conduct a review of R.Y.'s IEP within the one-year period prescribed by the IDEA and also failed to conduct updated evaluations of R.Y. within the IDEA'S three-year deadline. The evaluations it did conduct neglected to assess R.Y. in areas of documented and significant need, including speech-and-language, occupational, and physical therapy. Moreover, the psychoeducational evaluation was withheld from the Parents until the CSE meeting, more than six months after the report was completed. The CSE team did not include the required parent of another student with a disability, and the resulting IEP failed to include the state-mandated provision for parent counseling and training. The DOE failed to give the Parents prior written notice of the reasons it was changing R.Y.'s educational placement and the rea-

sons it was rejecting the Parents' proposed placement. Ultimately the DOE gave the Parents no notice of those reasons, and the evidence indicates that the CSE refused even to consider the Parents' proposal. Once the IEP was finalized, the DOE delayed R.Y.'s school placement and classroom assignment until days before the start of the new school year and refused even then to share the classroom assignment with the Parents.

Taken together, these procedural violations "display[ ] a pattern of indifference to the procedural requirements of the IDEA" in which the DOE "repeatedly violat[ed] its obligations under the statute." *L.O.*, 822 F.3d at 124. The DOE failed to meet a cascade of statutory deadlines and consistently disregarded the role of parents in the IDEA decisionmaking process. The DOE argues that R.Y. was not denied a FAPE because Mr. Y. was present at the CSE meeting and permitted to speak. *See, e.g.,* Def. Mem. 13 ("However, as long as the parents are listened to, this burden is met even if the DOE ultimately decides not to follow the parents' suggestions.") (quoting *E.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2217, 2013 WL 4495676, at *17 (E.D.N.Y. Aug. 19, 2013)). But the Parents' right to participate is not merely the right to speak, especially where, as here, the record is devoid of evidence that the CSE meaningfully considered the Parents' proposed placement. The Court finds that the DOE's procedural violations, when considered cumulatively, significantly impeded the Parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE. The cumulative violations here are at least as severe as in comparable cases where courts have found that the DOE deprived students of a FAPE. *See, e.g., L.O.*, 822 F.3d at 123–24 (finding a FAPE was denied where the CSE failed to consider evaluative materials, conduct an FBA, comply with speech-

and-language therapy requirements, and provide parent counseling and training); *R.K. ex rel R.K. v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 4478, 2011 WL 1131492, at *24–25 (E.D.N.Y. Jan. 21, 2011) (same where the CSE failed to conduct an FBA, provide parent counseling and training, and include sufficient speech-and-language therapy and other related services), *adopted by* 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E.*, 694 F.3d 167; *Davis v. Wappingers Cent. Sch. Dist.*, 772 F.Supp.2d 500, 508–09 (S.D.N.Y. 2010) (same where the CSE was missing two required members and the IEP was not in place in time for the start of the school year). Accordingly, the DOE denied R.Y. a FAPE for the 2012-2013 year.

■ Because the Court finds that the DOE denied R.Y. a FAPE on the basis of procedural violations, it need not address the parties' arguments with respect to the IEP's substantive adequacy and P053K's ability to implement the IEP. *See T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 876 n.3 (2d Cir. 2016). Indeed, "the [IDEA] provides that the fact of the procedural violation, if it significantly impedes the parents' opportunity to participate in the decisionmaking process, is a harm unto itself that results in the denial of a FAPE." *K.R. v. N.Y.C. Dep't of Educ.*, 107 F.Supp.3d 295, 309–10 n.120 (S.D.N.Y. 2015) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)). Nevertheless, a brief examination of the parties' additional arguments reinforces the Court's conclusion as to the cumulative effects of the procedural violations.

First, as one of their challenges to the substantive adequacy of the IEP, the Parents allege that the placement of R.Y. in a 6:1:1 classroom without a one-to-one paraprofessional would have been insufficiently supportive to confer educational benefit on R.Y. The IHO agreed, finding that the DOE denied R.Y. a FAPE on this ground and basing her conclusion on R.Y.'s psy-

choeducational evaluation, the CSE team's discussions, and the testimony of R.Y.'s teacher. IHO Op. 14-15. The SRO reversed, finding on the basis of Dr. Czarnecki's testimony, the CSE team's discussions, and the Rebecca School's progress report that the reasons for including a one-to-one paraprofessional in the 2011-2012 IEP were less concerning at the time of the 2012-2013 IEP. SRO Op. 18-19. Without wading into the substance of this dispute, the Court observes the similarity to the Second Circuit's recent decision in *L.O.*, where, "as here, ... the CSE failed to memorialize how it reached the terms of the IEPs," and so "reviewing authorities and courts are left to speculate many months, or as in this case, many years, later as to how the CSE reached the terms of the child's IEP ...." 822 F.3d at 110. The result of the DOE's procedural violations "is that [they] provide [ ] the reviewing authority with almost unfettered discretion, as it combs through the evaluative materials generated at the time the IEP was formulated, to match the terms of the IEP to any assertion contained in any existing document, irrespective of whether it was actually viewed and considered by the CSE." *Id.* There is no evidence in the record of how and why the CSE came to recommend that the 2011-2012 IEP's one-to-one paraprofessional provision not be maintained for 2012. *See* IHO Op. 14; Tr. 1261. The IHO and SRO were instead made to comb through the evidence and offer "post hoc rationalizations for how the CSE reached its conclusions," *L.O.*, 822 F.3d at 111, reaching two different, equally speculative conclusions as to what the CSE was thinking. One cumulative effect of the DOE's failures of notice and due consideration was to stifle administrative and judicial review of the CSE's decisionmaking and, relatedly, the Parents' IDEA right to contest the substantive adequacy of the IEP.

Second, as discussed above, the DOE refused to disclose R.Y.'s classroom assignment to the Parents despite having distributed it to P053K personnel by June 18, 2012. As part of their substantive challenge to the IEP, the Parents argue that P053K would not have been able to implement the terms of the IEP. For example, the Parents allege that P053K had insufficient sensory equipment, that it did not offer the recommended outside-of-class occupational therapy, and that its teachers could not implement several of the IEP's goals that incorporated DIR terminology. See Pl. Mem. 39-43. In response to the last of these challenges, the DOE argues that the Parents' claim is fatally speculative because "there is no testimony or evidence that the teacher at [P053K], who would have been assigned to teach R.Y. had she actually attended the school, could not have implemented the [DIR] goals." Def. Mem. 52 (citing FB, 132 F.Supp.3d at 551). The Parents' inability to collect evidence of the specific classroom teacher's abilities is directly traceable to the DOE's delays and its withholding of R.Y.'s classroom placement. Again, one cumulative effect of the DOE's procedural violations is a frustration of the Parents' rights to be informed about and involved in decisionmaking and to challenge the IEP on substantive grounds.

## C. Appropriateness of Placement

■ Having found that the DOE denied R.Y. a FAPE for the 2012-2013 school year, the Court proceeds to the second prong of the Burlington/Carter test: whether the Parents chose an appropriate placement when they unilaterally reenrolled R.Y. at the Rebecca School. M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 252 (2d Cir. 2012). The Parents bear the burden of establishing this prong. Id. "Although their unilateral placement need not 'meet the IDEA definition of a [FAPE],' as would a program provided by the public school system, it must be 'reasonably calculated to enable the child to receive educational benefits.'" Id. (alteration in original) (citations omitted) (quoting Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006)).

The SRO declined to address this question, SRO Op. 23, but a previous IHO concluded in 2009 that the Rebecca School was an appropriate placement for R.Y. at that time, Ex. B at 44-45, and the IHO in the present action reached the same conclusion as to 2012-2013, IHO Op. 15-16. Relying on the Rebecca School progress report, as well as the testimony of the Parents and the Rebecca School professionals, the 2012-2013 IHO found that the Rebecca School assigned licensed or certified professionals to R.Y. and provided her with occupational, physical, speech– and-language, and music therapy. IHO Op. 16. The IHO also found that R.Y. was placed in an appropriate classroom for her functional abilities, and the IHO credited the testimony of R.Y.'s Rebecca School teacher that "'someone is pretty much with [R.Y.] all day long' to prevent her from becoming lost during instruction." Id. (quoting Tr. 1093). Finally, the IHO found that R.Y. "progressed academically and socially-emotionally during the year." Id.

To be an appropriate placement, the Rebecca School needed to "provide 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" Frank G., 459 F.3d at 365 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). The DOE argues that the IHO's conclusion should be rejected because, in its view, the Rebecca School could not provide R.Y. with the necessary services. The DOE points out that, compared to the IEP's recommendations, the

Rebecca School provided R.Y. with fewer therapy sessions per week and no counseling. Def. Mem. 55-56. But the DOE confuses the necessary-services standard of the IDEA with the set of recommended services outlined in the IEP; the IEP did not bind the Rebecca School. *E.H. v. N.Y.C. Dep't of Educ.*, 164 F.Supp.3d 539, 556–57 (S.D.N.Y.2016). The evidence indicates that the Rebecca School met annually to review R.Y.'s progress and to determine the configuration and quantity of services that would best support that progress. *See* Tr. 714-15. In other words, the Rebecca School provided services specially designed to meet the unique needs of R.Y. Likewise, although the Parents acknowledge that the Rebecca School did not provide R.Y. with counseling as the IEP recommended, *see* Pl. Opp. 50-51, ECF No. 24, the unrebutted testimony indicates that R.Y. "receive [d] music therapy to meet that counseling need," Tr. 694, as the result of an individualized determination that traditional talk or play therapy would have been inhibited by R.Y.'s particular developmental challenges, Tr. 694-95. The Rebecca School's program director testified that R.Y. had attained "incredible progress and success in the time that she ha[d] music therapy." Tr. 694. That the Rebecca School's number of therapy sessions or method of delivery did not match those recommended in the now-invalidated IEP is not a sufficient basis to overturn the reasoned decision of the IHO. *See E.H.*, 164 F.Supp.3d at 556-57 ("[W]here the Rebecca School's program differs materially from the IEP's mandates, Plaintiff has pointed out these elements of the IEP were either unexplained or superfluous given the Rebecca School's other services and methods.").

The IHO's conclusion that the Rebecca School was an appropriate placement is buttressed by the fact that the CSE team relied on the Rebecca School's progress report in its deliberations, *see* Ex. II at 3-4; Ex. 4 at 1-2; Tr. 128, and even incorpo-rated the report's language, often verbatim, into the IEP's goals, *compare* Ex. 7 at 7-15, *with* Ex. 2 at 4-11. *See E.H.*, 164 F.Supp.3d at 556–57 ("That the CSE saw fit to use the Rebecca School's goals implicitly admits the competency of the Rebecca School in educating and determining goals for a child such as M.K. . . . ."); *A.D. v. Bd. of Educ.*, 690 F.Supp.2d 193, 208 (S.D.N.Y. 2010) ("Indeed, insofar as the CSE elected to utilize and rely upon the reports and assessments produced by Rebecca . . . the [DOE]'s reliance on such materials weighs in favor [of], not against, Rebecca's appropriateness."). In this litigation the DOE even relies exclusively on the Rebecca School report and the input of Rebecca School staff to excuse the DOE's own failure to independently evaluate R.Y. with regard to occupational, physical, and speech-and-language therapy. *See* Def. Mem. 16-17; Def. Reply 6-7. Accordingly, the Court defers to the IHO's reasoned opinion that the Rebecca School was an appropriate placement. *See M.H.*, 685 F.3d at 253–54.

### D. Balance of the Equities

██ The final prong of the *Burlington/Carter* test requires the Parents to show that the equities favor them. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 185 (2d Cir. 2012). In other words, the Parents' claims may be denied if the Court finds that they acted unreasonably. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III). The IHO found that the equities here favored the Parents. IHO Op. 16. The SRO declined to address this question, SRO Op. 23, and in its briefs to this Court the DOE did not respond to the Parents' arguments for affirming the IHO's finding. The Court agrees with the IHO that the record contains a number of examples of the Parents acting reasonably and cooperating with the evaluation and placement process. *See* IHO Op. 16. For example, Dr. Czarnecki

testified that, as far as he was aware, the parents were "fully cooperative with the testing process," Tr. 524, and Mr. Y.'s testimony indicates that they cooperated with the DOE's last-minute request to reschedule the CSE meeting, see Tr. 1220-21. Mr. Y. made clear to the CSE team that the Parents were willing to visit any proposed placement with an open mind and to enroll R.Y. there if appropriate. See Ex. 4 at 4; Ex. II at 4; Tr. 1256. After receiving the IEP, the Parents wrote to the DOE to notify it of their objections and their intent to enroll R.Y. in the Rebecca School "for the start of the 2012-2013 school year." Ex. D; accord Tr. 1261-63. The evidence is uncontradicted that the Parents acted reasonably in the IEP process, and the Court, therefore, defers to the IHO's determination that the equities favor the Parents. See C.L. v. N.Y.C. Dep't of Educ., No. 12 Civ. 1676, 2013 WL 93361, at *8–10 (S.D.N.Y. Jan. 3, 2013), aff'd, 552 Fed.Appx. 81 (2d Cir. 2014) (summary order).

## CONCLUSION

Plaintiffs having succeeded on all three prongs of the Burlington/Carter test, their motion for summary judgment is GRANTED, and the DOE's cross-motion is DENIED. The Court finds that Plaintiffs are entitled to be reimbursed by the DOE for the Rebecca School tuition expenses for the 2012-2013 school year to the extent the DOE has not already provided such funds in conjunction with a pendency placement. Additionally, pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), the Court will award reasonably attorneys' fees and costs to Plaintiffs. By **October 12, 2016,** Plaintiffs shall file a particularized request for reasonable attorneys' fees and costs, together with supporting documentation, that complies with 20 U.S.C. § 1415(i)(3)(C). By **October 19, 2016,** the DOE shall file any objections thereto, after which the Court will render its final judgment.

SO ORDERED.

## APPENDIX: GLOSSARY
## OF ACRONYMS

BIP—Behavioral Intervention Plan

CSE—Committee on Special Education

DOE—New York City Commissioner and Department of Education

DIR—Development, Individual-Difference, Relationship/Floortime

FAPE—Free Appropriate Public Education

FBA—Functional Behavioral Assessment

FNR—Final Notice of Recommendation

IDEA—Individuals with Disabilities Education Act

IEP—Individualized Education Program

IHO—Impartial Hearing Officer

SRO—State Review Officer